# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 5, 2005 Session

## STATE OF TENNESSEE v. WILLIAM GLENN ROGERS

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Montgomery County**
**No. 38939     Robert W. Wedemeyer, Judge**

---

**No. M2002-01798-SC-DDT-DD - Filed February 17, 2006**

---

In this capital case, the defendant, William Glenn Rogers, was convicted of first degree premeditated murder, two counts of first degree felony murder, especially aggravated kidnapping, rape of a child, and two counts of criminal impersonation in connection with the 1996 abduction, rape, and murder of nine-year-old Jacqueline Beard. The trial court merged the felony murder convictions with the premeditated murder conviction. Based on four aggravating circumstances, the jury imposed a sentence of death for the murder. The trial court sentenced Rogers to an effective sentence of forty-eight years for the other convictions. The Court of Criminal Appeals affirmed. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(1), we designated the following issues for oral argument:[1] 1) whether the trial court erred in failing to suppress Rogers' statements to law enforcement officers; 2) whether the trial court erred in supplementing the appellate record with mental health and social services records pertaining to the victim's brother, Jeremy Beard; 3) whether the trial court violated Rogers' constitutional rights by limiting cross-examination of Jeremy Beard; 4) whether the trial court committed harmful error in its instruction defining "intentionally"; 5) whether the evidence is insufficient to support the convictions for first degree murder, kidnapping, and rape; 6) whether the evidence is insufficient to support the aggravating circumstances; and 7) whether the sentence of death is disproportionate or invalid under the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed these issues and the remainder of the issues raised by Rogers, we conclude that they do not warrant relief. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON, and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, JR., J., dissenting.

Brock Mehler, Nashville, Tennessee, and Jerome M. Converse, Springfield, Tennessee, for the appellant, William Glenn Rogers.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory and Elizabeth T. Ryan, Assistant Attorneys General; John Wesley Carney, Jr., District Attorney General; and C. Daniel Brollier and Lance A. Baker, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

At the guilt phase of the trial, the State presented proof that on July 3, 1996, nine-year-old Jacqueline ("Jackie") Beard was playing with her twelve-year-old brother, Jeremy Beard, and her eleven-year-old cousin, Michael Carl Webber, at a mud puddle near her home in the Cumberland Heights area of Clarksville in Montgomery County. The defendant, thirty-four-year-old William Glenn Rogers, approached the children and introduced himself as "Tommy Robertson." He said he was an undercover police officer, offered the children fireworks, and invited them to go swimming. Jackie went home and told her mother, Jeannie Meyer, about the man. Mrs. Meyer took Jackie back to the mud puddle to investigate. While the children played with the fireworks, Mrs. Meyer talked with Rogers, who continued to identify himself as undercover officer Tommy Robertson. After approximately thirty-five minutes, Rogers left in his car.

At around 1:30 p.m. on July 8, 1996, Rogers appeared at the Meyer residence asking about a lost key. Jackie was with her mother when Mrs. Meyer spoke with Rogers. Rogers was last seen walking down the road toward a nearby abandoned trailer. A few minutes later, Mrs. Meyer gave Jackie permission to pick blackberries to take to the doctor's office where Mrs. Meyer had an appointment that afternoon. Jackie changed her shorts immediately before leaving the house. At 1:55 p.m., Mrs. Meyer was ready to leave and called for Jackie but could not find her. At around 2:00 p.m., a neighbor, Mike Smith, saw a car matching the description of Rogers' car leaving the immediate area. Smith had seen the same car heading in the direction of the Meyer residence about an hour or two earlier. Mrs. Meyer searched the area by car and on foot to no avail. Jackie was never seen alive again.

Mrs. Meyer reported her daughter's disappearance to the authorities. A composite drawing of the suspect was published in the Clarksville newspaper. Several people reported to the Montgomery County Sheriff's Department that the person in the drawing resembled Rogers.

On July 11, 1996, law enforcement officers questioned Rogers, who at first denied being in the Cumberland Heights area. In his next interview, however, Rogers told the officers that he had

been in the area on July 3, 1996, shooting fireworks with three boys. He later acknowledged that Jackie was one of the three children. Rogers admitted speaking with Mrs. Meyer about his lost key on July 8, 1996, but denied seeing Jackie that day. He said he walked to the abandoned trailer, went to the bathroom there, and then left in his car to look for a job. As the questioning continued, Rogers changed his story again and acknowledged that Jackie was present during his conversation with her mother on July 8, 1996. Rogers ultimately confessed that, after leaving the abandoned trailer, he accidently ran over Jackie as he backed up his car. Rogers said he heard a thud, discovered the victim under the car, and pulled her out. Her chest was moving as she tried to inhale, and blood was coming out of her nose. Rogers saw tire tracks across her right calf, right shoulder, and neck. He covered the victim's head with a shirt that he removed from the trunk of the car. Rogers placed the victim in the front passenger seat of the car, drove to a bridge over the Cumberland River, and threw her body, along with a sandal that had fallen from her foot, into the water. He stated that he did not touch her "in any way sexually or abusive." Rogers reduced this story to writing and signed the statement. Rogers made a diagram depicting how his car had run over the victim. He also signed the back of a photograph of the victim where he had written, "This is the girl I hit."

The following day, July 12, 1996, when officers asked Rogers about the possibility that the victim's fingerprints were in the car, Rogers changed his story yet again. In a second written statement, Rogers corrected his earlier statement by adding that the victim had gotten into the passenger side of his car and talked to him for about five minutes before she left saying her mother had to go to the doctor. Later on July 12, 1996, Rogers went with officers and his court-appointed attorney to the sites where he allegedly had run over the victim and thrown her body into the river. Rogers re-enacted the events of July 8, 1996, in a manner consistent with his written statements.

Investigation of the abandoned trailer showed that the victim's home and yard were visible from a bay window. A search of Rogers' car revealed a handheld telescope, a can of glass cleaner, and a map opened to the Middle Tennessee region, including the Land Between the Lakes area. A floor mat was on the driver's side but not the passenger's side. Although Rogers' fingerprints were on loose items in the car, officers found no fingerprints on the car's interior surfaces. Divers searched in the Cumberland River near the bridge where Rogers said he had thrown the victim's body, but nothing was found.

On November 8, 1996, four months after the victim's disappearance, two deer hunters discovered the victim's skull in a remote, wooded area in Land Between the Lakes in Stewart County. DNA analysis of the teeth established that the mitochondrial DNA sequence matched the DNA sample from the victim's mother. The skeletal remains of the victim were scattered around the area, which was several hundred yards from the Cumberland River and approximately forty-eight miles from her home. Both of the victim's sandals were found at the scene. The clothing worn by the victim when she disappeared was strewn near the bones. Her shirt had been turned completely inside out, and human semen stains were on the inside crotch of her shorts. A DNA sequence could

3

not be obtained from the semen stains for comparison to the DNA sample provided by Rogers.[2] However, fibers consistent with carpet in Rogers' house were found in his car and on the victim's shorts.

Dr. Murray K. Marks, a forensic anthropologist, examined the victim's skeletal remains. He testified that the remains had been in the area from three to ten months. Dr. Marks explained that some of the victim's bones – the hands, the feet, one entire leg, and the lower part of another leg – were never recovered and probably had been removed from the scene by animals. Dr. Marks could not determine the cause of death but stated that he found no ante-mortem trauma to the bones such as would be expected had a car run over the victim. Likewise, Dr. Robert Lee, the Stewart County Medical Examiner, was unable to determine the cause or manner of the victim's death.

Rogers' estranged wife, Juanita Rogers, testified that on July 4, 1996, she and Rogers went to Land Between the Lakes. On the drive back, they stopped at a picnic area off Dover Road about ten to fifteen miles from where the victim's body was found. After walking in the woods, Rogers remarked to his wife that "you could bury a body back here and nobody would ever find it." Mrs. Rogers also testified that on July 8, 1996, the day of the victim's disappearance, she did not see Rogers from before lunch until after 6:00 p.m. When he appeared that evening, his pants were muddy at the knees. The outside of the car also was muddy. Rogers told his wife that he had been in a tobacco field on Dover Road. When she noticed a spot of blood on his shirt, he told her that he had cut his finger, but she did not see a cut. Although she had given Rogers money to put gasoline in the car earlier in the day, the tank was almost empty. Mrs. Rogers also noticed small fingerprints on the inside of the passenger side windshield. The muddy prints went down the windshield. When asked by his wife if a child had been in the car, Rogers said no.

Mrs. Rogers further testified that on July 9, 1996, the day following the victim's disappearance, she accompanied Rogers to the garbage dump. She thought it was unusual that Rogers took only one bag of trash all the way to the dump. She noticed that the car had been cleaned since the day before, both inside and out, but Rogers denied cleaning it. On July 11, 1996, after the police contacted Rogers, he told his wife he had informed the police that he had been with her the entire afternoon of July 8, 1996. She refused to support his alibi. On the evening of July 11, 1996, after his arrest, Rogers called his wife and told her that he had confessed to vehicular homicide and would be home in a couple of hours.

Rogers made several additional, sometimes contradictory, statements about his involvement in the victim's death. He called his wife numerous times from jail seeking to speak with her and promising, if she would pick up the telephone, he would tell her what really happened and where the victim could be found. Rogers also wrote his wife a letter stating that the victim's death had been

---

[2] Meghan Clement, an expert in forensic serology and DNA analysis, explained that there were four possible reasons that she was unable to obtain a sequence from the stain: the DNA was too degraded; the quantity of the DNA in the sample was insufficient; the DNA in the sample came from multiple sources, either two sources of semen or one source of semen and vaginal fluid from the victim; or the chemical inhibitors from environmental contaminants prevented the sequence from being obtained.

an accident, had not been planned or thought out, and had "just happened." Rogers told his mother and half-brother that he had run over the victim and informed his mother that she should not worry because "all they could get him for was vehicular homicide." Rogers sent the victim's stepfather a letter, in which he wrote that he did not hurt the victim in any way. Rogers also contacted David Ross, a Clarksville reporter, and denied ever hitting the victim with his car. Rogers told Ross that he had last seen the victim on July 8, 1996, as she walked away from his car toward her house. Rogers said he had told the police what they wanted to hear because he was confused and frightened.

Rogers presented evidence that law enforcement officers had investigated three other suspects in the case: Quinton Donaldson, Tommy Robertson, and Chandler Scott. Rogers also tried to point out discrepancies and contradictions in the State's evidence and offered proof that he was looking for a job on the day the victim disappeared. Three people testified that Rogers applied for a job at a service station on Riverside Drive in Clarksville around 4:30 to 5:00 p.m. on July 8, 1996. According to the witnesses, he was driving a blue pickup truck and wearing a mechanic's uniform.

On rebuttal, an investigator with the Montgomery County Sheriff's Department testified that Rogers had never mentioned wearing a mechanic's uniform or applying for a job at a service station on July 8, 1996. Furthermore, there was no evidence that Rogers ever drove a blue pickup truck.

Based upon the above evidence, the jury convicted Rogers of first degree premeditated murder, first degree felony murder in the perpetration of a kidnapping, first degree felony murder in the perpetration of a rape, especially aggravated kidnapping, rape of a child, and two counts of criminal impersonation. The trial court merged the felony murder convictions with the premeditated murder conviction. A sentencing hearing was conducted to determine punishment.

During the sentencing phase, the State presented proof that Rogers had pleaded guilty to two counts of aggravated assault in Gwinnett County, Georgia, on April 12, 1991. A prosecutor from Gwinnett County testified that the statutory elements of the offenses involved the use of violence to the person.

The victim's mother, Jeannie Meyer, testified that she lost her job because she spent so much time searching for the victim after she disappeared. Mrs. Meyer stated that the victim's brother, Jeremy, felt guilty that he had not been there to save his sister. Following his sister's murder, Jeremy had been placed in juvenile homes and hospitalized for posttraumatic stress disorder, depression, and anxiety. His treatment had cost thousands of dollars. The victim's other brother, Joshua, was angry and refused to discuss his sister's death. Mrs. Meyer testified that she would never get over the loss of her only daughter and felt powerless and devastated. Mrs. Meyer said she felt an enormous amount of guilt. She described the victim as an intelligent, musically talented, happy child with many friends.

In mitigation, Rogers presented the testimony of his older sister, his father and other family members, and friends. Their testimony revealed that Rogers' parents, Cynthia and Lazarus Rogers, first divorced in 1961 when Rogers' sister, Mildred, was two years old. After Rogers was born on

March 24, 1962, his parents remarried. In 1964, his mother left again and took the children with her. She later told Lazarus Rogers that he was not Rogers' biological father.

When Rogers was a young child, his mother married Danny Schexnayder, by whom she had two sons, Danny, Jr., and David. Rogers' mother and stepfather would argue and fight. The home was dirty and unkempt. Schexnayder also showed marked partiality toward Danny, Jr. and David. Schexnayder shunned Rogers' attempts to be close to him and physically and verbally abused Rogers. Mildred Rogers told how Schexnayder would hold Rogers up in the air, spank him, and drop him to the floor. She related that Schexnayder had beaten Rogers about the head with a tether ball pole. Rogers also was chained to his bed for long periods of time. When Rogers soiled his mattress, his stepfather would push his head into the soiled area.

When Rogers and his sister went unfed, as they often did, Schexnayder would tell them that their father had sent no child support. While not physically abusive herself, Rogers' mother would not intervene to protect Rogers and ignored the children when Schexnayder was present. She would not allow Rogers' father to visit. Gifts sent by their father were taken away from Rogers and his sister. In addition, Rogers witnessed his sister being sexually abused by Schexnayder's brother, who also may have abused Rogers. Rogers reported being sexually abused by other persons, including a man who gave him a ride when he ran away from home. Mildred Rogers also recounted that Rogers suffered eye and head injuries in a serious automobile accident in 1980.

Rogers was described as withdrawn and friendless as a child. When chained to his bed, he would howl like a wolf. He bit and hit other children at school, where he was nicknamed "Wolfie." His former elementary school principal, Victoria Meares, described him as aggressive and a serious disciplinary problem. Rogers ran away from home and stole. Eventually, Rogers was sent to a group home for boys, where he was allegedly abused, and then to the Louisiana Training Institute ("LTI"), a juvenile facility. Dr. Cecile Guin, a social worker from Louisiana, testified that at the time Rogers entered LTI the facility was notorious for its poor conditions and mistreatment of its occupants. Among some of the egregious acts reported were the guards' hitting the children with belt buckles, chaining them to beds, slamming doors against them, and hanging them from clothes lines.

Lazarus Rogers confirmed that he had little contact with his son when Rogers was young. Rogers had called several times complaining that his mother was not good to him, but Lazarus Rogers claimed not to have known what was going on in the Schexnayder household. When Rogers was in the seventh grade, he ran away to his father's house. He said that his stepfather had tried to beat him with a wire clothes hanger. Lazarus Rogers further testified that Rogers' wife, Juanita, was much older than Rogers and very dominant. Lazarus Rogers recalled that he was present on July 8, 1996, at approximately 12:30 p.m., when Rogers told Juanita that he was going to a cabinet shop to look for work and she reacted angrily because she did not want him to go.

Rogers was evaluated by two mental health experts for the defense. Dr. Thomas Neilson, a clinical psychologist, testified that Rogers' unstable childhood bred insecurity and a sense of abandonment. Dr. Neilson opined that the physical, emotional, and sexual trauma of Rogers'

childhood had permanently affected how Rogers' brain functioned and led to mood swings and violent behavior. Dr. Neilson also recounted that, after leaving LTI in 1978, Rogers had been sent to the Oakley Training School in Mississippi in 1979 and had been incarcerated as an adult in Florida from 1981 to 1984, in Mississippi from 1984 to 1988, and in Georgia from 1990 to 1994. Dr. Neilson diagnosed Rogers as suffering from posttraumatic stress disorder, depressive disorder not otherwise specified (i.e., mild to moderate depression), dissociative disorder not otherwise specified, and personality disorder not otherwise specified with antisocial and borderline features (i.e., mixed personality disorder). Dr. Neilson explained that persons suffering from dissociative disorder report having other personalities and will withdraw from situations too traumatic to experience. This type of behavior indicates severe childhood trauma. Rogers reported two other identities: Billy or William Little and Roger. Letters written by Rogers' other personalities were introduced into evidence. According to Dr. Neilson, however, Rogers did not suffer from "full blown" dissociative identity disorder, commonly known as split or multiple personalities. Rogers had a Global Assessment of Functioning number of fifty, which meant that he was severely impaired. Dr. Neilson reported that Rogers' verbal IQ was 95, his performance IQ was 127, and his full-scale IQ was 108. Dr. Neilson found no neuro-organic impairments.

Dr. Keith Caruso, a forensic and general psychiatrist, described Rogers' life as a downward spiral and diagnosed Rogers as having antisocial personality disorder and borderline personality disorder. Dr. Caruso stated that Rogers exhibited all of the common characteristics of antisocial personality disorder: engaging in criminal behavior, deceitfulness, impulsiveness, irritability, aggressiveness, and lack of regard for the danger of a situation. Dr. Caruso explained that borderline personality disorder is a severe condition characterized by unstable emotions and relationships and sensitivity to abandonment. Dr. Caruso opined that at the time of the offense in this case Rogers was suffering from extreme emotional distress, was subject to several stressors, and was in an "abandonment crisis" because his relationship with his wife was in jeopardy and he feared losing his father. Dr. Caruso did not diagnose Rogers with posttraumatic stress disorder and did not think that psychotic or dissociative symptoms had any bearing on the offense. Dr. Caruso also had ruled out a diagnosis of pedophilia and did not think that Rogers was malingering.

Dr. Mark Cunningham, a clinical and forensic psychologist, also testified for the defense. Based on studies of various populations of prisoners, Dr. Cunningham performed a violence risk assessment of Rogers to determine the likelihood of his future violent behavior. Dr. Cunningham opined that Rogers' potential for violent behavior was below the base rate and that Rogers had an eight to seventeen percent chance of perpetrating a violent act in prison. Dr. Cunningham stated that he had factored in Rogers' previous escape from prison in determining that the risk of violence from Rogers was low in prison but high in the community.

In rebuttal, the State called Juanita Rogers to introduce a letter in which Rogers told her that he would not plead guilty to something that he had not done and stated, "If I do get time, they will either kill me trying to escape or I'll kill myself." Both Mrs. Rogers and Lisa Sanders, Rogers' former wife, testified that Rogers had never mentioned being physically or sexually abused as a child.

Dr. William Bernet, a psychiatrist, testified for the State that, based on his evaluations of Rogers and his review of background information and interviews with Rogers' wife, Rogers suffered from a dissociative disorder not otherwise specified, possible pedophilia, malingering, and antisocial personality disorder. Dr. Bernet stated that, although Rogers suffered a mental disorder, he was able to appreciate the wrongfulness of his misconduct. Dr. Bernet opined that no connection existed between the offense and Rogers' dissociative disorder or difficult childhood. The crime, Dr. Bernet said, was driven by Rogers' antisocial personality disorder and pedophilia.

Based upon this proof, the jury found that the State had proven beyond a reasonable doubt all four statutory aggravating circumstances: the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older; the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in the committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any rape or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(1), (2), (6) and (7). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances. As a result, the jury sentenced Rogers to death for the murder of Jackie Beard.

## ANALYSIS

### Rogers' Statements to Law Enforcement Officers

Rogers asserts that the admission into evidence of the oral and written statements he gave law enforcement officers on July 11 and 12, 1996, violated his rights under the federal and state constitutions. Specifically, he argues that his statements should have been suppressed because of the failure to re-administer Miranda[3] warnings when he was subjected to custodial interrogation after a polygraph examination.

The evidence at the suppression hearing showed that on July 11, 1996, Sergeant Clifton Smith of the Montgomery County Sheriff's Department spoke with Rogers at his place of employment. Rogers agreed to go to the Montgomery County Criminal Justice Center for an interview. Rogers drove himself to the Criminal Justice Center, where he was questioned by Brett Murray, a special agent with the F.B.I., and Billy Batson, an investigator with the Montgomery County Sheriff's Department. Sergeant Smith also was present in the interview room. Soon after arriving, Rogers stated that he was the person they were looking for, i.e., the person in the composite drawing published in the newspaper. Sergeant Smith advised Rogers of his Miranda rights and, at 11:18 a.m., Rogers signed a form waiving those rights. Rogers also signed forms consenting to a search of his vehicle and a search of his residence. After further questioning, Rogers went with

_____

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

8

Agent Murray and other officers to his residence for the search. While at his residence, Rogers consented to take a polygraph examination. Rogers then accompanied Agent Murray to an F.B.I. office in the federal building in Clarksville for administration of the polygraph examination.

The polygraph examiner, F.B.I. Special Agent Steven Hooker, obtained Rogers' written consent for the examination but did not re-administer Miranda warnings. Agent Hooker testified that he did not advise Rogers of his Miranda rights before the examination or during the interview afterward because Rogers was not in custody and had been advised of his rights earlier that day. Agent Hooker conducted the polygraph examination at approximately 2:35 p.m. After the examination, Agent Hooker informed Rogers that some of his answers indicated deception. Rogers then made a statement that he "had hit [the victim] with [his] car and driven over her and killed her." At that time, Agent Hooker called in Agent Murray and Investigator Batson to question Rogers. During the interrogation that followed, Rogers made further incriminating statements. He said that he had accidently run over the victim, that she was breathing when he placed her in the passenger side of his car, and that he had driven to a bridge over the Cumberland River where he threw her body into the water. At around 4:00 p.m., Rogers reduced these oral statements to writing and signed the document. No additional Miranda warnings were given before the statements were made. Investigator Batson testified that he had felt that Rogers fully understood his Miranda rights based on the warnings given four to five hours earlier.

On July 12, 1996, the day after the polygraph examination, Agent Murray and Investigator Batson interviewed Rogers again. Agent Murray re-advised Rogers of his Miranda rights. Rogers waived his rights and gave a second written statement. He corrected his earlier statement by adding that the victim had been in his car for about five minutes before the accident. Later that same day, accompanied by his appointed attorney, Rogers showed officers the site where he had allegedly run over the victim and the bridge where he had allegedly thrown her body into the river. His account of the victim's death was consistent with his written statement from the previous day.

In denying the motion to suppress, the trial court stated that the evidence was clear that Rogers had been advised of his Miranda rights and had signed a written waiver of those rights and that there was no evidence indicating that Rogers' statements were involuntary. The trial court found that "maybe as much as five or even six hours, at the outside," could have passed between when Rogers waived his Miranda rights and gave his statement, but that this was not "an unusual amount of time." The trial court concluded that the interrogation changed from non-custodial to custodial when Rogers made incriminating statements to Agent Hooker after the polygraph examination. The trial court ruled, however, that the attachment of custody did not trigger a requirement for additional Miranda warnings.

A trial court's findings of fact on a suppression issue are binding upon an appellate court unless the evidence preponderates against those findings. State v. Sawyer, 156 S.W.3d 531, 533 (Tenn. 2005). We, however, review the trial court's conclusions of law de novo. Id.

9

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[4] The corresponding provision of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Encompassed within these constitutional provisions is the right to the presence of counsel during police-initiated custodial interrogation. See State v. Saylor, 117 S.W.3d 239, 244 n.3 (Tenn. 2003) (contrasting the Sixth Amendment right to counsel which guarantees the accused the assistance of counsel after adversarial proceedings have begun).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court established procedural safeguards to protect an accused's privilege against self-incrimination. These safeguards require that the police warn any person subjected to custodial interrogation

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief. Although the warnings must be given prior to custodial interrogation, the Court did not indicate whether or when the warnings must be renewed.

In Wyrick v. Fields, 459 U.S. 42 (1982), the United States Supreme Court rejected a per se rule requiring the police to re-advise a suspect of his Miranda rights before questioning him about results of a polygraph examination. Such a rule would be "an unjustifiable restriction on reasonable police questioning." Id. at 49. A valid waiver of Miranda rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights. Id. at 47. Courts must examine the totality of the circumstances to determine whether renewed warnings are required. Id. at 48.

Factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. See People v. Mickle, 814 P.2d 290, 305 (Cal. 1991). Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

---

[4] This privilege against self-incrimination applies to the states through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 6 (1964).

In this case, the custodial interrogation resulting in the first written statement occurred approximately five hours after Rogers had been advised of and waived his Miranda rights. Tennessee cases have upheld the admissibility of statements made the day after administration of Miranda warnings. See Reaves v. State, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975); Mitchell v. State, 458 S.W.2d 630, 633 (Tenn. Crim. App. 1970). Other jurisdictions have approved of time spans of similar lengths. See, e.g., United States v. Rodriguez-Preciado, 399 F.3d 1118, 1128-29 (9th Cir. 2005) (sixteen hours); People v. Dela Pena, 72 F.3d 767, 770 (9th Cir. 1995) (fifteen hours); State v. Trostle, 951 P.2d 869, 879 (Ariz. 1997) (seven hours); Osborne v. State, 430 S.E.2d 576, 578-79 (Ga. 1993) (next day); State v. Rowe, 479 A.2d 1296, 1299 (Me. 1984) (nine hours). We conclude that the five hours between the waiver of Miranda rights by Rogers and his subsequent custodial interrogation did not constitute a significant time lapse.

The custodial interrogation was conducted by Agent Murray and Investigator Batson, the same two officers who had interviewed Rogers after the initial advisement of Miranda rights. The change in the location of the questioning did not mandate repeated Miranda warnings. See State v. Aucoin, 756 S.W.2d 705, 709-10 (Tenn. Crim. App. 1988) (defendant made initial statement at scene following waiver of Miranda rights and then gave subsequent statement at police station without receiving additional warnings); State v. Pride, 667 S.W.2d 102, 104 (Tenn. Crim. App. 1983) (same). Nor is it determinative that Rogers accompanied officers to his residence for the search before the interrogation continued at the F.B.I. office. See Shane v. State, 615 N.E.2d 425, 427-28 (Ind. 1993) (holding that where defendant had been advised of Miranda rights at police station before being transported to hospital for taking of blood and hair samples, re-advisement of rights was not required upon return to police station). The polygraph examination and post-polygraph questioning were part of one continuous interrogation that had been preceded by Miranda warnings and execution of a waiver. The questioning throughout the day covered the same subject matter. Although Rogers received no official reminder of the prior advisement, he was continuously in the company of law enforcement officers. Rogers was familiar with the criminal justice system. Nothing in the record indicates that Rogers was incapable of remembering the advisement of his rights given just a few hours earlier.

Rogers asserts that new Miranda warnings were required when the interrogation changed from non-custodial to custodial. The overwhelming majority view, however, is that early, non-custodial Miranda warnings may be effective and that re-warnings are not *ipso facto* required when formal custody attaches. See, e.g., Dela Pena, 72 F.3d at 769 (Miranda warnings given at night were effective the following day, approximately fifteen hours later, and defendant's subsequent custodial status was not the "determining factor" in the analysis); Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984) (defendant's rights were not violated by the failure to reissue Miranda warnings at the time of arrest, notwithstanding that defendant confessed approximately three hours after receiving warnings when not in custody and by a different officer); Upton v. State, 36 S.W.3d 740, 744 (Ark. 2001) (Miranda warnings and waiver were continually effective even though defendant's status changed from that of voluntary, potential witness to that of a suspect in custody); State v. Burge, 487 A.2d 532, 543 (Conn. 1985) (defendant's waiver of Miranda rights was adequate when he was neither a suspect nor in custody, and his confessions which were made four hours later when

he was in custody were admissible); State v. Tolbert, 850 A.2d 1192, 1200 (Md. 2004) (a defendant's statements are not inadmissible merely because police did not reissue properly administered Miranda warnings given to the defendant when the defendant was not in custody); Commonwealth v. Colby, 663 N.E.2d 808, 810 (Mass. 1996) (further Miranda warnings were not required after defendant failed a polygraph examination and his status became custodial); State v. Monroe, 711 A.2d 878, 886-87 (N.H. 1998) (pre-polygraph Miranda warnings were sufficient to protect defendant's Fifth Amendment right against self-incrimination even if the post-polygraph interrogation became custodial); State v. Rupe, 683 P.2d 571, 581 n.4 (Wash. 1984) (renewal of Miranda warnings was unnecessary where defendant "was effectively advised of his rights shortly before becoming technically in custody").

A conclusion that good faith early warnings are *per se* ineffective, even when those warnings are "sufficiently proximate" to actual custody to inform a suspect of his constitutional rights, would elevate form over substance. Tolbert, 850 A.2d at 1198. Once a suspect has made a knowing and voluntary waiver of his Miranda rights, there is no *per se* requirement to continually re-advise him of those rights. Monroe, 711 A.2d at 886. We join those jurisdictions holding that renewed Miranda warnings are not required based solely on a change in a suspect's status from non-custodial to custodial.

Rogers was advised of his Miranda rights and made a knowing and voluntary waiver of those rights on the morning of July 11, 1996. The Miranda warnings were sufficiently proximate to the custodial interrogation that afternoon to inform Rogers of his constitutional rights. Neither the five-hour time lapse nor any intervening event rendered Rogers incapable of remembering the prior advisement of his rights. Under the totality of the circumstances, the failure to re-administer Miranda warnings to Rogers upon the attachment of custody after the polygraph examination did not render his subsequent statements on July 11,1996, inadmissible. The July 12, 1996, statements were immediately preceded by the re-administration of Miranda warnings and execution of a waiver. Nothing in the record indicates that the statements from either day were involuntary. We hold, therefore, that the admission into evidence of the oral and written statements obtained from Rogers as a result of custodial interrogation did not violate his constitutional rights.

### Supplementation of Appellate Record

The State argues that the trial court erred in supplementing the appellate record with mental health and social services records pertaining to the victim's brother, Jeremy Beard, because the documents were never admitted into evidence at trial. Rogers contends that the appellate record was properly supplemented with the documents to provide a complete and accurate context for the issue of whether the trial court erred in limiting cross-examination of Jeremy Beard.

During a pre-trial hearing in December 1999, the trial court agreed to order the Harriet Cohn Mental Health Center and the Department of Children's Services to submit their records pertaining to Jeremy Beard to the court "under seal" so that the parties could inspect, review, and copy them. Just prior to opening statements at trial, the State informed the trial court of the existence of several

12

reports in those records indicating that Jeremy had "allegedly told psychologists that his biological father taught him to have sex with his sister." The State asked the court to extend its prior ruling, restricting cross-examination of Jeremy about two incidents that occurred after the victim's death, to cover the allegations in the reports. The trial court took the matter under advisement.

After direct and cross-examination of Jeremy Beard, the trial court conducted a jury-out hearing for defense counsel to make an offer of proof regarding the additional questions he wanted to ask Jeremy about the allegations in the reports. Objecting to the hearsay nature of the reports, the prosecutor stated:

> It's going to be real easy to try and play games and confuse this witness on this because a lot of these reports – there are tons of them. There is a whole big box that the Court is aware of, all these records from every different social agency you can think of, and a lot of times they have repeated reports from some other social worker, counselor or psychologist and [it] just keeps getting repeated in different places and a lot of times.

Defense counsel told the trial court that if Jeremy denied making the statements in the reports, counsel intended to present the testimony of the persons to whom the statements allegedly were made.[5] Following a brief recess, the trial court ruled that the defense would not be able to cross-examine Jeremy about the allegations in the reports because, "based on the evidence that [the court had] heard so far in the trial," the alleged incidents were too remote in time and irrelevant. The trial court advised the parties that its ruling might change based on additional legal research or additional evidence. Neither the records nor any reports were introduced into evidence. Nor were any such documents attached to the motion for a new trial or amended motion for a new trial. Rogers presented no oral argument on the cross-examination issue during the hearing on the motion for a new trial.

After release of the Court of Criminal Appeals' opinion stating that the record showed almost no support for Rogers' claims about Jeremy Beard's past conduct, Rogers filed a petition to rehear and motion to supplement the appellate record with the mental health and social services records pertaining to Jeremy Beard, which records Rogers claimed had been mistakenly omitted from the appellate record. The Court of Criminal Appeals denied relief, holding that the evidence was minimally relevant and its exclusion resulted in no prejudice. This Court denied a similar motion to supplement filed by Rogers, noting that the motion was more properly directed to the trial court. Thereafter, Rogers filed in the trial court a motion to supplement the appellate record and an agreed order signed by defense counsel and the assistant district attorney general who had tried the case. In the motion, Rogers alleged that certain sealed records pertaining to Rogers' step-granddaughter were accidently transmitted to the appellate court instead of the sealed records pertaining to Jeremy

---

[5] At a subsequent jury-out hearing, Rogers presented testimony of the victim's mother concerning the statements. No other witnesses testified about the statements.

Beard.[6]  Judge John H. Gasaway, III, sitting in place of the original trial judge who had been appointed to the Court of Criminal Appeals, entered the agreed order directing the circuit court clerk to transmit Jeremy Beard's records to the Appellate Court Clerk's Office for inclusion in the appellate record currently before this Court.  The State filed an application for extraordinary appeal. See Tenn. R. App. P. 10.  We denied the State's application without prejudice and allowed the State to raise the supplementation issue in this direct appeal.

The procedure for correction or modification of the appellate record is set forth in Tennessee Rule of Appellate Procedure 24(e), which provides:

> If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth.  Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court.  Absent extraordinary circumstances, the determination of the trial court is conclusive.  If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.

The authority to supplement the record is limited by Rule 24(g), which states that

> [n]othing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

We recently addressed a similar issue involving supplementation of the appellate record in State v. Housler, 167 S.W.3d 294 (Tenn. 2005).  In that case, the record was supplemented with the transcript of co-defendant Courtney Mathews' trial.  We observed that the Court has upheld supplementation of the record by the trial court under Rule 24 in several cases involving matters not introduced into evidence at trial. Id. at 296.  Although the Mathews transcript was never entered into evidence or attached to the motion for a new trial, the record reflected that the trial court considered the transcript in ruling on whether the State had presented inconsistent theories in the trials of Housler and Mathews. Id. at 298.  Specific comments made by the trial judge during the hearing on the motion for a new trial and the hearing on the motion to supplement demonstrated that he had read the Mathews transcript.  Furthermore, the order supplementing the record stated that the court had denied relief on the inconsistent theories issue upon its "consideration, review, and comparison of the trial testimony of the State's prosecution of Courtney Mathews and the State's prosecution of David Housler." Id.  We therefore upheld supplementation of the appellate record, stating that

---

[6] It is unclear how or why the step-granddaughter's records ever became a part of the appellate record.

any matter appropriately considered by the trial court is properly includable in the appellate record and may be added to the record under Rule 24(g) when such matter is "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal."

Id.

The present case is distinguishable from Housler. Jeremy Beard's mental health and social services records were sent under seal to the trial court in the course of pre-trial discovery, not for the court's consideration. Even when filed in the trial court, papers relating to discovery are ordinarily excluded from the record. See Tenn. R. App. P. 24(a). Although defense counsel used several reports during his jury-out questioning of Jeremy Beard, the record does not reflect that these reports were before the trial court for its consideration. The record contains no indication that the trial court intended to review or did review any part of Jeremy Beard's records. No statement in the order supplementing the appellate record shows that the trial court considered the records in ruling on the cross-examination issue. At most, the record demonstrates that the trial court was aware of Jeremy Beard's records. Because the trial court did not consider Jeremy Beard's records, they are not "properly includable" in the appellate record. See Housler, 167 S.W.3d at 298.

If a matter is not "properly includable," then it cannot be added to the appellate record, regardless of whether the trial court determines under Rule 24(g) that such matter is "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." We recognize that absent extraordinary circumstances, a trial court's determination regarding supplementation is conclusive. See Tenn. R. App. P. 24(e). We conclude, however, that extraordinary circumstances exist when a matter that was never considered by the trial court or the jury is added to the record. Particularly under the circumstances of this case, where the judge who ruled on the motion to supplement was not the judge at trial, the record must support a finding that the matter is "properly includable."

We hold, therefore, that the trial court erred in supplementing the appellate record with mental health and social services records pertaining to Jeremy Beard. The sealed records, which are marked "Collective Exhibit A" (filing date by the circuit court clerk of October 4, 2004) and "Collective Exhibit B" (filing date by the circuit court clerk of October 14, 2004), shall remain in the appellate record for any future review of the supplementation issue but have not been considered by this Court in its review of the cross-examination issue.

**Cross-Examination of Jeremy Beard**

Rogers asserts that the trial court violated his constitutional rights by limiting cross-examination of the victim's brother, Jeremy Beard, regarding Jeremy's alleged sexual activity with the victim, his treatment for mental illness, incidents of inappropriate sexual behavior, and solicitation of another to kidnap and rape him. Rogers sought to introduce the evidence to show that someone other than himself was responsible for the semen stain on the victim's shorts.

15

Prior to trial, the State filed a motion seeking to limit cross-examination of Jeremy Beard about two incidents: a letter Jeremy sent to Quinton Donaldson, one of the early suspects in this case, asking Donaldson to kidnap and rape him; and contact between Jeremy and an adult male he had met in an internet chat room. The State argued that these incidents were irrelevant to the case because they occurred after the victim's murder. The trial court agreed and tentatively granted the State's motion. However, the trial court indicated that the court would reconsider its ruling if the defense established relevance during the trial. As discussed earlier under the supplementation issue, just before opening statements at trial, the State asked the trial court to extend its ruling to include statements made by Jeremy that his biological father had taught him to have sex with the victim. Rogers responded that the evidence was relevant because it showed that Jeremy could have been the source of the semen found on the victim's shorts. The trial court withheld its ruling on the issue.

During the jury-out hearing on this matter, defense counsel asked sixteen-year-old Jeremy Beard[7] if he had told mental health professionals during treatment at certain facilities in February 1997 that his biological father had taught him how to have sex with his sister and that his father had watched them engage in sexual acts. Jeremy repeatedly stated that he could not remember if he had ever made such comments.[8] Jeremy testified at trial that he was living in a residential treatment facility and previously had lived in several mental hospitals, detention centers, group homes, and foster homes. Jeremy acknowledged numerous contacts with counselors and therapists at the various facilities where he had received treatment following his sister's murder, but he remembered only one time when he had talked about his sexual behavior. He denied that he was prohibited from being placed in a foster home where small children were present, but he admitted that during an April 1999 psychological evaluation he had stated that he thought about sex all the time. He acknowledged that he had been accused of inappropriate behavior toward his stepfather, but he did not remember the nature of the accusation. Finally, Jeremy admitted writing the letter to Quinton Donaldson several months after the victim's murder. Although defense counsel specifically submitted the Donaldson letter as an exhibit, no other documents were entered into evidence during the jury-out hearing.

The trial court ruled that Jeremy could not be cross-examined about alleged sexual activity with the victim because, even if it happened, it was "remote in time and irrelevant and possibly confusing to the jury and inadmissible." In denying the motion for a new trial, the trial court expanded its ruling by holding that the evidence was not admissible under the third-party defense theory. Quoting State v. Carruthers, 35 S.W.3d 516, 575 (Tenn. 2000) (appendix), the trial court stated that evidence in support of a third-party defense "must be the type that would be admissible

---

[7] As noted earlier, Jeremy was twelve years old at the time of his sister's disappearance.

[8] Rogers subsequently made an offer of proof as to the testimony of the victim's mother regarding the allegations. Mrs. Meyer testified that Jeremy had told her that he had been taught by his natural father how to have sex with his sister. Mrs. Meyer passed this statement along to Jeremy's therapists and social workers so that they could determine if Jeremy was telling the truth. Mrs. Meyer indicated that Jeremy had last made such a statement about six months or a year after the victim's death. She stated that although Jeremy had not indicated when this alleged sexual activity occurred, he had not seen his natural father since April of 1991. The trial court ruled that Rogers would not be allowed to cross-examine Mrs. Meyer about the allegations. Rogers has not appealed that ruling.

16

against the third party if he or she were on trial, and the proof must be limited to facts inconsistent with the [defendant's] guilt." The trial court concluded that the alleged facts were not inconsistent with Rogers' guilt, and the evidence would not be admissible in a trial of Jeremy Beard under Rule 404(b) of the Tennessee Rules of Evidence because it showed Jeremy's propensity toward sexual activity with the victim.[9]

We have since clarified, however, that Rule 404(b) does not apply when a third-party defense is raised. State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002). In that case, we held that "'[e]vidence of crimes, wrongs or acts, if relevant, is not excluded by Rule 404(b) if the acts were committed by a person other than the accused.'" Id. (quoting State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997)). Furthermore, we recently rejected the "direct connection" test applied by a majority of states, which requires that the evidence directly connect the third party with the substance of the crime and clearly point out someone besides the accused as the guilty person. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003). We stated that "such a standard imposes too high a threshold for the admissibility of evidence concerning third-party culpability." Id. (footnote omitted). We hereby reaffirm our holding in Powers that the admissibility of third-party defense evidence is governed by the Rules of Evidence and not by any stricter standard. Id.

Having concluded that the trial court erred in ruling that a stricter standard applied for admissibility of third-party defense evidence, we next review the trial court's exclusion of the evidence on relevancy grounds. Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that meets the test of relevance may yet be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Generally, a trial court's exclusion of evidence based on irrelevance will not be overturned on appeal except upon a clear showing of abuse of discretion. Powers, 101 S.W.3d at 395.

---

[9] The version of Rule 404(b) in effect at the time of trial provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>     (1) The court upon request must hold a hearing outside the jury's presence;
>     (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>     (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In 2003, Rule 404(b) was amended by moving (b)(3) to (b)(4) and including as an additional condition that "(3) The court must find proof of the other crime, wrong, or act to be clear and convincing[.]"

17

To the extent that the defense claimed that Jeremy Beard was a "third party" responsible for the semen stain on the victim's shorts, evidence of Jeremy's sexual conduct with the victim would be relevant. Rogers offered no evidence, however, substantiating a claim that Jeremy Beard had ever engaged in sexual relations with his sister. When questioned during the jury-out hearing, Jeremy stated that he did not recall telling mental health professionals that his biological father had taught him how to have sex with his sister. Even if Rogers had offered evidence confirming that Jeremy made the statements, such proof would not establish that Jeremy had actually had sex with the victim versus simply reporting that he had.

Moreover, no proof connects Jeremy to the semen stain found on the victim's shorts. Rogers asserts that if Jeremy and the victim had engaged in sexual activity the night prior to or the morning of the day she disappeared, then semen would have remained inside her vagina and could have continued to seep out after she had changed her shorts immediately before her disappearance. No such inference can be drawn from the proffered evidence; the defense theory is mere speculation. When given the opportunity outside of the presence of the jury to ask Jeremy whether he had sex with his sister the evening before or the morning of her disappearance, defense counsel did not pursue this crucial line of questioning. Without some proof that the statements attributed to Jeremy resulted from actual sexual activity with his sister and that such conduct continued until her disappearance, it cannot be said that evidence concerning Jeremy's alleged sexual history with the victim makes the existence of any fact of consequence more or less probable than it would be without the evidence. See Tenn. R. Evid. 401. We agree with the trial court that this evidence was irrelevant. Furthermore, any probative value of the evidence would be substantially outweighed by the risk of confusing and misleading the jury. See Tenn. R. Evid. 403.[10] Therefore, we conclude that the trial court did not abuse its discretion in limiting cross-examination of Jeremy Beard about his alleged sexual history with the victim.

As we noted in Powers, an evidentiary ruling ordinarily does not rise to the level of a constitutional violation. 101 S.W.3d at 397. In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, a court should consider whether: 1) the excluded evidence is critical to the defense; 2) the excluded evidence bears sufficient indicia of reliability; and 3) the interest supporting the exclusion is substantially important. Id.; see Chambers v. Mississippi, 410 U.S. 284 (1973). In Chambers, the defendant was precluded from introducing evidence that another person had confessed to the crime. Rogers' proffered evidence concerning Jeremy Beard's alleged sexual activity with the victim lacks sufficient indicia of reliability and falls far short of the type of critical evidence considered in Chambers. We further hold, therefore, that even if exclusion of the evidence constituted error, it would not amount to a constitutional violation. Moreover, we are convinced that, even if a constitutional harmless error

---

[10] Because we conclude that the evidence was inadmissible under Rules 401 and 403, we need not determine whether the statements attributed to Jeremy were inadmissible hearsay. However, we note that, contrary to the State's assertion, Powers did not suggest that Rules 401 and 403, standing alone, are sufficient bases upon which to determine the admissibility of third-party defense evidence. Rather, admissibility is governed by all the Rules of Evidence, including the rule against hearsay.

standard were applicable, any error would be harmless beyond a reasonable doubt in light of the overwhelming evidence of Rogers' guilt.

Rogers also contends that the trial court erred in excluding testimony and evidence of a letter written by Jeremy Beard asking Quinton Donaldson to kidnap and rape him. In denying the motion for a new trial, the trial court concluded that the Donaldson letter was inadmissible as irrelevant.[11] The letter was sent in January 1997, approximately two months after the victim's body was discovered. Upon receiving the letter, Donaldson contacted the authorities, who then questioned Jeremy about it. The written record of that interview reflects that Jeremy heard Donaldson's name from his mother, Mrs. Meyer, and sent the letter because he was angry at his parents. We agree that the letter was irrelevant under Tennessee Rule of Evidence 401. The letter does not have any tendency to make the assertion that Donaldson was involved in the victim's disappearance and murder more probable. Therefore, we conclude that the trial court did not abuse its discretion in limiting cross-examination of Jeremy Beard about the Donaldson letter. We further conclude that any error, constitutional or otherwise, from excluding this evidence would be harmless.

Finally, Rogers argues that the limitation on cross-examination of Jeremy Beard deprived him of a constitutionally reliable sentencing determination. First, he asserts that the absence of evidence that Jeremy might have been the source of the semen "necessarily impacted" the sentence because two of the aggravating circumstances depended upon a finding that Rogers had committed or attempted to commit rape and lingering doubt that Rogers' was guilty of rape would be a mitigating circumstance. Second, he contends that the lack of evidence regarding Jeremy's history of sexual abuse prevented a proper evaluation of Mrs. Meyer's victim impact testimony which implied that Jeremy had no psychological and emotional problems before his sister's murder. Rogers did not present either argument at the sentencing hearing. Furthermore, because we have concluded that the trial court erred in supplementing the appellate record with Jeremy's mental health and social services records, these assertions are not supported by any evidence properly before us. Moreover, even if these records had been offered as evidence, any error as a result of limiting cross-examination about them would be harmless beyond a reasonable doubt as to sentencing in light of the overwhelming evidence supporting the aggravating circumstances.

### Instruction Defining "Intentionally"

During the guilt phase, the trial court instructed the jury that a "person acts 'intentionally' when that person acts with a conscious objective or desire either to cause a particular result or to engage in particular conduct." Relying on State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Rogers argues that this instruction lessened the State's burden of proof because it allowed the jury to convict him based on a finding that he acted with the conscious objective to engage in a particular conduct, i.e., backing up his car, rather than with the conscious objective to kill the victim. The issue

---

[11] The trial court also ruled that Rogers waived any argument concerning admissibility of the evidence concerning Jeremy's relationship with the man from the internet chat room because Rogers did not raise the issue at trial. Rogers has presented no argument in this Court regarding that issue.

was not raised in the trial court. Rogers asserts, however, that because Page was not decided until almost six months after the motion for a new trial was heard, the issue was not waived. He also contends that the Court should review the issue as plain error.

We recently rejected a similar argument in State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005), also a capital murder case. Noting that we had not previously addressed the holding in Page, a second-degree-murder case, we agreed that a proper instruction defining "knowingly" or "intentionally" does not include the nature-of-conduct and circumstances-surrounding-conduct language because second degree murder and first degree premeditated murder are result-of-conduct offenses. Faulkner, 154 S.W.3d at 58. We found no authority, however, supporting the conclusion in Page that the erroneous instruction lessened the State's burden of proof. Faulkner, 154 S.W.3d at 59. We held that the inclusion of the nature-of-conduct language in Faulkner's case was not an error of constitutional dimension because the instruction properly defined "intentionally" with regard to the result of conduct and any risk that the jury relied on the wrong definition was eliminated by the finding of premeditation which "requires a previously formed intent to kill." Id. at 60 (citation omitted). The instructional error was harmless because in finding that Faulkner acted with premeditation, the jury necessarily found that his conscious objective was to cause the result of his conduct, i.e., the victim's death. Id. at 61.

We reach the same result in this case. The instruction properly defined "intentionally" with regard to the result of conduct. The jury was instructed that "[p]remeditation means that the intent to kill must have been formed prior to the act itself." The jury could not have convicted Rogers of premeditated first degree murder unless it found that he acted with a previously formed intent to kill. Therefore, contrary to Rogers' assertion, even if the jury believed Rogers' account of the victim's death, it could not have convicted him based solely on a finding that it was his conscious objective to back up his car. In finding that Rogers acted with premeditation, the jury necessarily found that he acted with a specific intent to cause the victim's death. Therefore, the inclusion of the nature-of-conduct language was mere surplusage that did not affect the outcome of the trial. See Tenn. R. Crim. P. 52(a). Because the erroneous instruction defining "intentionally" was harmless, Rogers is not entitled to relief under the plain error doctrine. See Faulkner, 154 S.W.3d at 61.

**Sufficiency of Evidence to Support Convictions**

Rogers argues that the evidence is insufficient to support his convictions for first degree murder, kidnapping, and rape. When a defendant challenges the sufficiency of the convicting evidence, the standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002). A guilty verdict by a jury accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). A conviction may be based on circumstantial evidence when the facts are "so clearly interwoven and connected that the finger of

guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (citations omitted).

Rogers contends that the evidence is insufficient to prove premeditated first degree murder because the condition of the victim's remains does not rule out the accidental homicide to which he confessed. However, there was no visible trauma to any of the victim's bones supporting Rogers' claim that he ran over the victim with his car. Instead, the evidence shows that Rogers approached the victim and her playmates on July 3, 1996, and offered to take them swimming, that he returned to the victim's house on July 8, 1996, that he went to a nearby abandoned trailer from which he could observe the victim's house and see her come out alone to pick blackberries, that she was alive when she was in his car, that she was raped, and that she was driven 48.5 miles to the place where her body was found. This evidence is sufficient to support Rogers' conviction for premeditated first degree murder.

Rogers next asserts that the evidence is insufficient to prove murder in the perpetration of a kidnapping because the proof does not exclude his theory that the victim was already dead when he transported her to the bridge. Rogers claims that the victim's body could have been carried down the Cumberland River to a point near Land Between the Lakes and then dragged inland by animals. However, the evidence excludes this theory. The statement Rogers gave police indicates that the victim was alive when he put her in his car. Although Rogers said that one of the victim's sandals came off and that he threw it into the water separately, both sandals were found with the victim's remains. Although Rogers claimed that he was applying for a job during the afternoon of July 8, 1996, his pants and car were muddy when he returned home that evening. The testimony of Rogers' wife that she saw small muddy fingerprints on the inside of the passenger side windshield of his car that evening supports a finding that the victim was alive and struggling to escape from the car when she was with Rogers. This evidence is sufficient to support Rogers' convictions for especially aggravated kidnapping and first degree felony murder in the perpetration of a kidnapping.

Finally, Rogers challenges his convictions for rape of a child and first degree felony murder in the perpetration of a rape on the ground that the evidence is entirely circumstantial, consisting solely of unidentified semen on the victim's shorts. Rogers claims that the proof does not exclude the possibility that Jeremy Beard was the source of the semen. By his own account, Rogers was the last person to see the victim alive, and he carried her away in his car. Immediately before her disappearance, the victim had changed into clean shorts. When the victim's remains were discovered in the woods, human semen stains were on the shorts. The source of the semen could not be determined. Because the victim's shorts were clean at the time of her abduction, the reasonable conclusion is that Rogers, her abductor, was the source of the semen. The record contains no evidence indicating that Jeremy Beard could have been responsible for the semen stains. Statements allegedly made by Jeremy, that his father had taught him how to have sex with his sister, referred to a period of time several years before the victim's disappearance. No proof was presented that Jeremy Beard had ever actually engaged in sexual activity with his sister or that any such conduct continued until her disappearance. Consequently, Jeremy's alleged statements do not cast doubt upon the conclusion that Rogers was the source of the semen. In addition, the victim's shirt was

turned completely inside out, which would suggest that it had been removed from her body by a human rather than having been pulled off by animals or fallen off during the decomposition process. Rogers' removal of the victim's shirt would be consistent with sexual activity. This evidence is sufficient to support Rogers' convictions for rape of a child and first degree felony murder in the perpetration of a rape.

Viewing the evidence in the light most favorable to the State, we conclude that the proof points the finger of guilt unerringly at Rogers and Rogers alone. Therefore, we hold that his challenge to the sufficiency of the convicting evidence is without merit.

### Sufficiency of Evidence to Support Aggravating Circumstances

Rogers challenges the sufficiency of the evidence establishing two of the four aggravating circumstances.[12] Specifically, he asserts that the evidence is insufficient to support the (i)(6) aggravator (the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another) and the (i)(7) aggravator (the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in the committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any rape or kidnapping). See Tenn. Code Ann. § 39-13-204(i)(6) and (7). He claims that insufficient evidence exists for the underlying rape supporting the felony murder aggravator and that, without the rape, there was no crime for which he could have sought to avoid arrest and prosecution. As the State notes, these aggravating circumstances also are supported by Rogers' convictions for kidnapping and murder in the perpetration of a kidnapping. Furthermore, we have concluded that the evidence is sufficient to support the rape conviction. Accordingly, there is no merit to this argument.

Rogers also contends that the trial court's failure to instruct the jury as to the meaning of "knowingly" in the (i)(7) aggravator tainted the jury's finding of that aggravating circumstance. The (i)(7) aggravator provides for the imposition of the death sentence where the "murder was knowingly committed" during the commission of certain listed felonies. See Tenn. Code Ann. § 39-13-204(i)(7). Rogers argues that the instruction defining "knowingly" at the guilt phase[13] did not cure this omission because it incorrectly defined "knowingly" and allowed the jury to base its finding on awareness of conduct alone and therefore violated his right to a complete and accurate instruction on the law under State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002). Rogers did not raise this issue at the sentencing hearing or in the motion for a new trial. In any event, any

---

[12] Rogers does not dispute the overwhelming evidence supporting the (i)(1) aggravator (the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older) and the (i)(2) aggravator (the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence). See Tenn. Code Ann. § 39-13-204(i)(1) and (2).

[13] The definition of "knowingly" was given in connection with the charge on second degree murder and stated, "A person acts 'knowingly' if that person acts with an awareness: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result."

22

instructional error would be harmless beyond a reasonable doubt as to sentencing. By convicting Rogers of first degree premeditated murder, the jury found that he acted intentionally with regard to the result of his conduct. See Faulkner, 154 S.W.3d at 60. This finding necessarily proved that he acted knowingly. Cf. Tenn. Code Ann. § 39-11-301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally").

## Mandatory Review

We are bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1). Having thoroughly reviewed the record, we find no indication that the sentence of death was imposed in an arbitrary fashion. We also conclude that the evidence overwhelmingly supports the jury's findings with respect to the four aggravating circumstances. We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). We are mindful of the following principles applicable to proportionality review:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

23

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. See State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997). In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. See id.

The proof in this case showed that Rogers kidnapped, raped, and murdered the nine-year-old victim. He had seen the victim five days earlier when she was with her brother and cousin. Rogers returned to her home and waited for an opportunity to capture her alone. Rogers drove the victim almost fifty miles away to a remote, wooded area where he left her body to be scavenged by animals.

Rogers, a white male, was thirty-forty years old at the time of the murder and had a prior criminal history including convictions for aggravated assault. Rogers did not cooperate with authorities or express remorse for the crime. To the contrary, he evaded responsibility by giving law enforcement officers conflicting statements. He toyed with the victim's family by contacting them but never disclosing where the victim's body was located. Rogers presented mitigating evidence that he was subjected to neglect and abuse as a child.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports, we conclude that the sentence of death imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The sentence of death has been upheld in numerous cases where the defendant raped and murdered a child. See, e.g., State v. Keen, 31 S.W.3d 196 (Tenn. 2000) (murder during rape of eight-year-old girl; (i)(1) and (i)(5) (heinous, atrocious or cruel) aggravators); State v. Irick, 762 S.W.2d 121 (Tenn. 1988) (murder during aggravated rape of seven-year-old girl; (i)(1), (i)(5), (i)(6), and (i)(7) aggravators); State v. Coe, 655 S.W.2d 903 (Tenn. 1983) (kidnapping, rape, and murder of eight-year-old girl; (i)(1), (i)(5), (i)(6), and (i)(7) aggravators).

A search of Rule 12 reports reveals only two cases in which a sentencing hearing was held and a sentence of life without parole was imposed for a murder involving a sexual assault on a child. See State v. Paul William Ware, No. 03C01-9705-CR-00164, 1999 WL 233592 (Tenn. Crim. App., Knoxville, Apr. 20, 1999) (defendant raped and murdered four-year-old victim, but he was intoxicated at the time); State v. James Lloyd Julian, II, No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn. Crim. App., Knoxville, July 24, 1997) (defendant raped and murdered three-year-old victim, but he was under the influence of marijuana and alcohol). In addition, a life sentence was imposed by the jury in State v. Bibbs, 806 S.W.2d 786 (Tenn. Crim. App. 1991). In that case, the defendant murdered an eleven-year-old girl who was a guest at the motel where the defendant worked as a security guard. The defendant hit the victim with a toilet seat and his gun and then threw her off the balcony of the motel. The jury did not find the (i)(1) and (i)(5) aggravating

circumstances, which were instructed at the sentencing hearing. The defendant's lack of any prior criminal record appeared to be the primary mitigating circumstance.

We reiterate that our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. State v. Davidson, 121 S.W.3d 600, 623 (Tenn. 2003) (citation omitted). Instead, our review requires that we identify an aberrant death sentence by determining whether the case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty previously was imposed. Id. After reviewing the cases discussed above and many others not specifically cited, we are of the opinion that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the actions of the defendant.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Rogers and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Rogers' convictions and sentence of death are affirmed. The sentence of death shall be carried out as provided by law on the 28th day of June, 2006, unless otherwise ordered by this Court or other proper authority. It appearing that defendant William Glenn Rogers is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

25