# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 9, 2013 Session

## STATE OF TENNESSEE v. FRANK GRAHAM

**Appeal from the Criminal Court for Shelby County**
**No. 10-05148      Chris Craft, Judge**

---

**No. W2012-00735-CCA-R3-CD  - Filed May 31, 2013**

---

A jury convicted the defendant, Frank Graham,[1] of the first degree premeditated murder of his ex-fiancee, Taffi Crawford.  The defendant received a life sentence.  On appeal, the defendant contests the sufficiency of the evidence establishing premeditation.  He also asserts that the trial court erred in refusing to suppress the statement he gave police, in which he acknowledged having accidentally shot the victim.  The defendant asserts that he was arrested without probable cause and that his waiver of rights was not valid because police did not inform him about the presence of an attorney who had been contacted by his family to represent him.  The defendant also appeals on the ground that the trial court erred in allowing certain testimony regarding prior bad acts.  After a thorough review of the record, we conclude that the trial court did not err, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and JEFFREY S. BIVINS, J.J., joined.

Paul J. Springer and Edward Bronsten, Memphis, Tennessee, for the appellant, Frank Graham.

Robert E. Cooper, Jr., Attorney General & Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Patience Branham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

---

[1]Although the defendant is identified as "Frank Graham" in court documents, he testified at trial that his name is Frank Graham III.

## Factual and Procedural History

The victim was shot on the morning of February 12, 2010, in the parking lot of the medical center at which she worked as a nurse. Despite the fact that the victim and defendant were no longer engaged, evidence was introduced at trial that the defendant was in constant contact with both the victim and a firefighter with whom he was convinced she was having a relationship. After the shooting, based on information obtained from the victim's acquaintances and from witnesses, police went to the defendant's apartment, where they found the car associated with the crime. The defendant was taken into custody and later gave a statement admitting responsibility for the shooting, which he claimed was accidental.

The defendant's attorneys moved to suppress the statement. At the hearing on the motion to suppress, the State introduced the testimony of Detective Robert Wilkie of the Memphis Police Department. Detective Wilkie testified that the defendant was interviewed beginning around 4:15 p.m. on February 12, 2010 and that he never indicated that he wanted an attorney. Detective Wilkie stated that the defendant was informed of his right to counsel and chose to waive it at the beginning of the interview. According to Detective Wilkie, the interview was interrupted around 5:00 p.m. by the crime scene investigators, who wanted to do a gunshot residue test. The interview resumed at 6:00 p.m., when officers provided dinner for the defendant. The defendant signed a statement, which was preceded by another advice of rights, at 8:13 p.m. Detective Wilkie testified that the defendant acknowledged shooting the victim, although he said that the shooting was an accident and that he had just been trying to scare her.

Attorney Michael Scholl testified that on the day of the crime, his office contacted him about a phone call asking him to represent the defendant. Mr. Scholl testified that he did not know if the call to his office came from the defendant or from the defendant's family. Mr. Scholl later spoke with a representative of the family and agreed to serve as the defendant's lawyer. Around lunchtime, Mr. Scholl ran into Sergeant William Merritt of the Memphis Police Department. Mr. Scholl told Sergeant Merritt that he was the defendant's attorney and that he wanted to participate in questioning of the defendant. Sergeant Merritt asked Mr. Scholl to wait for ten to fifteen minutes while he checked on the defendant's whereabouts and then reported that the defendant was not yet in custody. Mr. Scholl gave Sergeant Merritt his card with his cell phone number and told Sergeant Merritt that he represented the defendant. He never received a call informing him that the defendant was in custody, and he found out from the evening news that the defendant had given a statement. Mr. Scholl had no further involvement in the case.

Sergeant Merritt testified that his only involvement with the case was to escort the defendant from the tenth to the eleventh floor at the police station. The defendant arrived at the station in the late morning or early afternoon – to the best of Sergeant Merritt's recollection, sometime between ten and noon. Sergeant Merritt could not recall speaking with Mr. Scholl that day and recalled no other involvement in the case. According to Sergeant Merritt, if Mr. Scholl testified they had a conversation, "that could very well be because I don't think that he would come in here and fabricate something." However, he had no independent recollection of the conversation.

The defendant testified that he was arrested at his apartment around 9:00 or 9:30 a.m. He opened his apartment door when police knocked, and he was put in the back of a squad car for at least an hour. He recalled being escorted upstairs at the police station by Sergeant Merritt, and he was shackled to a bench. When Sergeant Merritt checked on him in thirty minutes, he asked to call his family. Officers continued to check on him, and he continued to ask to call his family. After two hours, he wrote the names and phone numbers of his mother, father, and sisters on a chalkboard in the room, which was photographed with the information written on it.

The defendant testified that the crime scene investigators then performed a gunshot residue test. When Detective Wilkie began the interview, the defendant's glasses could not be located, and the detectives read the advice of rights to him. The defendant testified that the hand-written notation indicating that the defendant had read the form aloud and did not need glasses was not there when he signed it. He acknowledged telling officers he understood it. The defendant testified that initially, he did not request a lawyer but did continually ask to call his family. However, Detective Wilkie "kept insinuating certain things and then at that point I asked for an attorney." He requested an attorney because as a firefighter, he had just undergone training on preserving a crime scene, and he knew that he "shouldn't be talking to the police." When the defendant requested an attorney, Detective Wilkie left, and another officer told the defendant that the victim had identified him and that he had been recorded by video equipment at the hospital. At that point, the other officer left and the defendant's face and arms were photographed by crime scene investigators.

Detective Wilkie brought the defendant dinner and began to question him again. The defendant reminded him that he had asked for an attorney, asked why he was still being questioned, and requested to make his phone call. The defendant testified that the officers told him he would not be able to make a call unless he signed a statement. No one told him that an attorney had been to the station on his behalf. The defendant testified he would not have made a statement if he had known that he had an attorney. He also testified that detectives coached him on what to say, that he did not review the statement prior to signing it, and that it did not accurately reflect the questions or his responses.

-3-

On cross-examination, the defendant acknowledged that he had attended college and could read and write. He acknowledged having signed a form stating he understood his rights, but testified he did not understand his rights at the time. The defendant was unaware that his family had contacted an attorney on his behalf until after he had signed his statement. Asked if he thought he already had an attorney, the defendant testified, "After I asked for one, yes. With my network of family and friends, without a doubt I knew –"

The trial court denied the defendant's motion to suppress his statement. In its order, the trial court found that both Mr. Scholl and Sergeant Merritt were credible witnesses, and that Mr. Scholl had the conversation he described with Sergeant Merritt but that Sergeant Merritt, who was not assigned to the case, promptly forgot it and did not alert the officers conducting the interview. The trial court further found that the defendant was not being truthful when he testified that he asked for an attorney. The trial court concluded the defendant voluntarily waived his rights. The trial court further found that Mr. Scholl was never hired to represent the defendant and ruled that even if Mr. Scholl had been retained, that fact had no effect on the voluntariness of the waiver. It found that officers were not acting with malice in any failure to inform Mr. Scholl that the defendant was in custody or failing to inform the defendant that Mr. Scholl was present. Because the trial court found that the defendant's statement was given freely and voluntarily and that the presence of a lawyer hired to represent him had no effect on the voluntariness of statement, the trial court refused to suppress the statement.

The jury trial took place from January 9 to January 16, 2012. The State presented the testimony of eyewitness Ramone Hall, who testified that on Friday, February 12, 2010, he was working at the medical center. At around 8:40 a.m., Mr. Hall was walking to his car to retrieve something when he saw the victim, Taffi Crawford, drive by him in the parking lot. Mr. Hall was reaching into his glove compartment when he heard a shot. He looked around and heard two more shots. Because he identified the sound as gunfire, he dropped into the car seat. After the shots subsided, he got out of his car and saw a white, 1990s model Mercury Sable "speeding off." Mr. Hall found the victim, who had been shot in the head, lying on the ground between two vehicles and recognized her by her name tag. He summoned a security guard. Mr. Hall initially assumed the victim was dead, but saw her breathing and asked the security guard to summon help from the ER. Mr. Hall gave a statement to police. Mr. Hall acknowledged that he did not see the shooting.

Fred Booker, an employee of Delta Medical Center, was walking through the parking lot on his way from an adjacent building to the hospital at around 9:00 a.m. Mr. Booker heard a shot and hid behind a van. Ten seconds later, he heard a woman who sounded hysterical. He then heard a man arguing and two more shots. Mr. Booker saw a car, which he described as a white Mercury or Ford with a blue, two-toned bumper, speed off. He then

and went over to Mr. Hall and the victim. On cross-examination, Mr. Booker testified that the arguing could have been two male voices. Mr. Booker's testimony was unclear regarding whether he saw a man running, but he acknowledged having described the suspect as having bright or light skin to the police.

A bystander, Pete Mack, testified that he was walking through the parking lot on his way to visit his doctor in a building adjacent to the hospital at around 9:00 a.m. on February 12, 2010, when he heard arguing and then a shot. Mr. Mack turned to see a man standing outside a car with an open door, pointing a gun toward the ground. A few seconds had passed since the first shot, and the man shot two more times. Mr. Mack saw the man get into a white car with a bumper that was blue on the passenger's side. No one else was in the car. The man drove past Mr. Mack, who was attempting to run away. Mr. Mack testified he would not be able to identify the man. Mr. Mack then went to where the victim, who appeared lifeless, was lying. On cross-examination, Mr. Mack acknowledged having told police he estimated the shooter was five feet eight or ten inches tall. He testified that he never saw anyone running.

Bridgette Collins, the victim's sister, testified that she worked at the medical center and was alerted to her sister's shooting by coworkers. When she arrived at the hospital, doctors informed her that the victim had suffered brain death; the victim subsequently passed away.

Shakila Hampton, who was a friend of the victim's from nursing school, testified that she and the victim graduated in August 2009, and that the victim was engaged to the defendant at the time. Ms. Hampton testified that the defendant and the victim attended a graduation party at a club. She testified that when the victim arrived, she told Ms. Hampton that the defendant was upset with her. Subsequently, when the victim, Ms. Hampton, and several friends were dancing, the defendant grabbed the victim by the arm and forced her from the club. The next time she saw the victim, the victim had a splint on her finger. About a week after the incident at the club, the victim had a party at her house, and she and the defendant were no longer dating at that time. Ms. Hampton also testified that the victim had, during the previous winter, shown her a bruise on her upper arm, and that the victim had appeared as though she had been crying on that occasion. On cross-examination, she acknowledged that she did not see club security intervene between the victim and defendant at the graduation party.

Another classmate of the victim, Damanai Johnson, also testified that he attended the party at the club. Mr. Johnson witnessed the victim and the defendant having "a pushing pulling match" in the parking lot. The next time he saw the victim, she had a splint on her finger. On cross-examination, Mr. Johnson testified that he did not think the victim was in

danger of "immediate bodily harm" in the parking lot.

Reverend Dwight Saulsberry, the pastor of the church both the victim and defendant attended, testified that the victim approached him to get help resolving some problems with the defendant through counseling and that she also sought to have Rev. Saulsberry speak to the defendant "because she wanted to get away from him." Rev. Saulsberry testified that the victim called him one Sunday in November or December hysterical and crying because the defendant had threatened to "blow her [motherf-----g] head off." The victim told Rev. Saulsberry that she had not wanted to sit with the defendant at church and at one point they went outside during the service. The defendant then made the threat. Rev. Saulsberry testified that the victim had also called him the day after a dance party celebrating her graduation where the defendant had grabbed her hand and broken her fingers. The victim was thinking of leaving the defendant, and after the defendant threatened her life, she told Rev. Saulsberry she wanted to get out of the relationship.

On cross-examination, Rev. Saulsberry testified that he encouraged the victim to contact police after her finger was broken, but she was afraid of "what he would do" and wanted Rev. Saulsberry to try to influence the defendant instead. He testified that the victim called him in the evening after the defendant threatened her during the Sunday service, which normally ended between eleven and noon. The victim was "terrified" of the defendant. He testified that although he served as Chaplain of Police, he could not make arrests himself and did not report the broken finger because he did not witness the incident. He stated that he did not recall the victim, defendant, or other parishioner mentioning the incident prior to the phone call.

David Tessaro, an officer with the Southaven Police Department, testified that on January 3, 2010, at around 5:58 a.m., he was called to the victim's home, where the victim and defendant had been arguing through a window, and the defendant had broken a six-by-eight inch pane in the window and then left. The defendant was later arrested based on the incident. On cross-examination, Officer Tessaro testified that his report indicated the defendant was the victim's boyfriend, and he would have noted if it had been an ex-boyfriend. He testified that it was possible that only the inside pane of the double-paned panel was broken, leaving shards on the sill.

James Oliver, an officer with the Memphis Police Department, testified that on the day of the murder, he responded to the scene of the shooting and, based on witness interviews at the scene, he developed the defendant as a suspect and obtained a description of the vehicle involved. The victim was lying between two cars with her feet toward the rear of the cars and was taken from the parking lot into the hospital. Officer Oliver interviewed five to six witnesses, some of whom only had information about the victim's past relationships.

Officer Oliver acknowledged that the information about the victim's boyfriend as a possible suspect was given to him by one of the witnesses who did not see the crime. He did not know if any cars had come and gone prior to his arrival on the scene.

An investigator with the Memphis Police Department, Ricky Davidson, testified that he took photographs and made diagrams of the scene. He identified pictures of the victim's car, three spent casings, and a bullet. Investigator Davidson also collected a bullet fragment that he testified was oxidized and could not have been fired recently enough to be involved with the crime.

Officer Charles Taylor of the Memphis Police Department participated in apprehending the defendant. Officer Taylor received a description of the defendant, along with his name and address and a description of the white Mercury Sable. When Officer Taylor arrived at the defendant's apartment complex, he observed a white Mercury Sable parked next to a black Mercedes which was running but unoccupied. A search revealed that the Mercury Sable was registered to James Lucas, and the Mercedes was registered to the defendant. The defendant answered his door when police knocked at 9:45 or 10:00 a.m. and informed officers he was about to leave town. He was placed in the back of a police car. Officer Taylor testified that he did not have any interaction with Mr. Lucas, but he did see other officers speak with him at the scene.

James Lucas, the defendant's neighbor, testified that he owned a 1999 Sable with a white body and blue front. Mr. Lucas testified that the defendant asked to borrow his car at approximately 7:15 a.m. on February 12, 2010. The defendant, who owned both the Mercedes and a green truck, allowed Mr. Lucas to borrow his truck so that Mr. Lucas could get his hair cut at around 8:30 a.m. When Mr. Lucas returned, he was detained by police for approximately one hour in the back of a car and then questioned. He identified the defendant from a line-up as the man who had borrowed his car that morning. He testified he did not know what the defendant had planned to do with his car.

Joe Stark, an officer with the homicide unit of the Memphis Police Department, testified that the shooting was initially handled by the felony assault unit because the victim was still alive, but that he was called to assist because of the likelihood of her death. Sergeant Stark interviewed witnesses at the scene and then went to the defendant's apartment and spoke with Mr. Lucas while he and the defendant were being detained. He testified Mr. Lucas was puzzled and cooperative and that he obtained the keys to the defendant's truck from Mr. Lucas.

Sergeant Stark participated in the search of the defendant's home pursuant to a warrant. A gun case and some keys were on the couch. Inside the case was a .40 caliber

-7-

loaded Glock handgun. One round was in the chamber of the gun, and twelve were in the clip; a box held additional rounds. The defendant's bedroom contained bags packed with clothing and the victim's cell phone records from December 18, 2009 to January 13, 2010. The phone records contained handwritten notes, with certain numbers circled, certain numbers apparently denoted as belonging to male or female users, and others linked to names. The key for the Mercury Sable was in the bedroom. Mr. Lucas gave Sergeant Stark permission to search his car, but no weapons were found. Sergeant Stark testified that the casings found at the shooting site were nine millimeter casings, and the Glock handgun he found at the defendant's apartment was not the weapon used in the shooting.

Special Agent Steve Scott, with the firearms identification unit of the Tennessee Bureau of Investigation, testified as an expert in firearms. Agent Scott examined the forty caliber Glock handgun, the thirteen cartridges and magazine, and three bullet casings and two bullets from the crime scene. Agent Scott testified that he fired three of the cartridges in testing the weapon. He testified that the weapon did not fire any of the casings recovered from the shooting, but that all the casings had been fired by the same gun. He testified that one of the bullets was a nine millimeter bullet which appeared to have blood on it, and it was not fired from the weapon he examined. The other was a .38 or .357 caliber bullet which also did not come from that weapon and which had spent some time exposed to the elements. On cross-examination, Agent Scott testified that he could not testify regarding whether the nine millimeter bullet had been fired through one of the three casings. He also stated he could not determine how long the other bullet had been outside.

Keon Pickford, with whom the defendant suspected the victim was having an affair, testified that he was a firefighter with the Memphis Fire Department, and he knew the defendant because they had trained together to be firefighters. Mr. Pickford testified that he met the victim at a restaurant in July 2009 and became Facebook friends with her. Shortly thereafter, the defendant obtained Mr. Pickford's phone number from a mutual acquaintance and called him to inquire how he knew the victim and to tell Mr. Pickford the victim was his fiancee. Mr. Pickford spoke with the victim about the defendant's phone call, and he and the victim continued to have contact by phone, speaking approximately once a week. Mr. Pickford met the victim once for lunch with friends and once for a brief drink in August 2009; he did not see her again.

The defendant, however, called Mr. Pickford "all the time," asking about Mr. Pickford's relationship with the victim. In October or November, the defendant showed up at Mr. Pickford's work, and Mr. Pickford advised him not to endanger his job and to let go of his past relationship with the victim. The defendant continued to call Mr. Pickford and became "intense," calling multiple times per day. After Mr. Pickford stopped answering calls from the defendant's number, some of the defendant's calls appeared to come from the

victim's number. Toward the end of January or beginning of February, the defendant threatened Mr. Pickford in a conversation that involved "us talking about . . . pulling pistols." Mr. Pickford reported the conversation to a supervisor and wrote a memo to the fire chief approximately one week before the victim's death. Mr. Pickford did not submit the memo until February 11, 2010, because he was hesitant to cost the defendant his job, but on that day he faxed it to the fire chief. The next morning, he got off work at the fire station at 7 a.m. and went to his other job as a barber because he had an 8:00 a.m. appointment. He did not leave the shop between 8:00 and 9:00, and he was not in the parking lot of the hospital at that time. Mr. Pickford testified that he was still cutting his client's hair when he was alerted to the shooting by phone.

On cross-examination, Mr. Pickford testified he never dated the victim and that he was dating someone else at the time. When Mr. Pickford left his work at 7 a.m. on the day of the shooting, he had not been at his regular station but had been working at a fire station located one block from the scene of the shooting. He had faxed his complaint regarding the defendant at 8:00 p.m. the previous night and denied faxing it on the 12th of February. Mr. Pickford arrived at the barbershop at around 7:45. He testified he did not call the defendant to tell the defendant to meet him and the victim at IHOP and that he did not see or speak with the victim at all that morning. He testified he was not kissing the victim in the parking lot. He acknowledged having talked to the victim daily in early January. He acknowledged telling an investigator from the DA's office that he had written the memo to "cover" himself and explained he was worried the situation would escalate.

Jewell Suggs, a Memphis Police officer, testified that Mr. Pickford was his barber at the time of the shooting. In February 2010, Mr. Pickford was cutting Mr. Suggs's hair when he received a telephone call regarding somebody being shot. Mr. Pickford was upset and fell to his knees. Mr. Suggs testified that he had arrived at the barbershop around 8:00 a.m. and Mr. Pickford arrived two or three minutes later. Mr. Suggs testified that after the shooting, he did not advise Mr. Pickford to go to the police and that he did not report the incident. He testified that he assumed that the other firefighter had shot the victim, but he acknowledged he did not tell the investigating officers his suspicion.

At the time of the shooting, Robert Wilkie was an officer in the felony assault bureau of the Memphis Police Department. Detective Wilkie and another detective interviewed the defendant, who signed a waiver of his Miranda rights at 4:24 p.m. Initially, the defendant denied having seen the victim that morning. After telling the police the details of his relationship with the victim, the defendant told detectives he had received a call the night before from someone – whom he didn't want to identify – who told him that the victim would be meeting Mr. Pickford at IHOP. He borrowed Mr. Lucas's car and went to the location but did not see them and drove home, where he was shortly arrested.

Thirty minutes into the interview, crime scene officers came to conduct a gunshot residue test on the defendant. Detective Wilkie got him dinner during this time. During dinner, the defendant told officers he had never before borrowed Mr. Lucas's car, and that he did so because he did not want to be recognized. The defendant told detectives that he last fired a gun two months prior to the interview, and Detective Wilkie confronted him with the fact that he had gunshot residue on his hands and face. At that point, the defendant asked if something had happened to the victim. Detective Wilkie told the defendant that she had been shot and that the only thing that would help him would be telling the truth. The defendant began to cry. Detective Wilkie asked him why he had shot the victim, and he said, "I was just trying to scare her." The defendant then gave a statement in which he admitted shooting the victim.

Although the exhibits are not included in the appellate record, the defendant's statement was read into the record. In his statement, he told police that he drove to IHOP between 7:45 and 7:50 a.m. because he expected to see the victim and Mr. Pickford. When they had not arrived by around 8:30 a.m., he drove to the parking lot at the hospital and saw the victim with Mr. Pickford. He followed the victim while she parked, jumped out, ran up to her and told her he had caught her. She fell, he leaned over her, and the gun accidentally discharged. The defendant said that he did not have the gun out when he got out of the car, but that he took it out when he stood up. The defendant asserted it was an accident and that he loved the victim and only wanted to scare her. The defendant then said "it's not like I stood over her and executed her," and he mimed aiming a gun at the ground and shooting three times. The defendant told officers that he threw the jacket and gloves he had worn out the window of the car, and that he took off his jeans and shoes at home.

Detective Wilkie asked about the gun used in the crime, and the defendant told him that he had used nine millimeter bullets in the forty caliber gun. Detective Wilkie did not believe the defendant's story because he thought that the gun would not shoot nine millimeter bullets and because the gun was fully loaded when police recovered it. The police then obtained a written version of the defendant's statement, which contained another advice of rights, beginning at 7:26 p.m.

On cross-examination, Detective Wilkie testified that the defendant was taken into custody around 10:00 a.m. and was not interviewed until around 4:15 p.m. He testified that, according to the defendant, the victim had told the defendant's sister that she was still in love with the defendant. He acknowledged he was not a ballistics expert and had not attempted to fire nine millimeter bullets from a forty caliber weapon. He did not know if a bullet was recovered from the victim or submitted for testing. He testified that the defendant's positive gunshot residue test was not inconsistent with wearing gloves because the residue was on his face and arms and not on his hands. He testified that he had forgotten to include the results

of the test in his notes.

Jeffrey Garey testified that he was a crime scene investigator with the Memphis Police Department and that he found gunshot residue on the defendant's elbows, forearms, and upper arms as well as the bridge of his nose. There was no residue on the defendant's hands or clothes. On cross-examination, Officer Garey testified that the defendant was cooperative and that gunshot residue was easy to wash off or transfer.

The State's final witness, forensic pathologist Dr. Miguel Laboy, testified that he found a gunshot wound on the temporal area of the left side of the victim's head and two other wounds on the left side of her face, with two exit wounds on the other side of her head. The victim also had two entry and two exit wounds on her left arm. One bullet and one fragment were recovered. He testified that he found no soot or stippling and that a handgun would not leave either if fired a few feet from the victim. He testified it was possible that the bullets passed through the victim's arm and then into her head. The victim died from multiple gunshot wounds inflicted in the course of a homicide.

The defense called several witnesses, beginning with Elizabeth Hayes, the record keeper for the Memphis Fire Department, who testified that the official copy of Mr. Pickford's memo about the defendant had been faxed twice, once on February 12, 2010 at 12:19 p.m. and once on February 11, 2010 at 8:01 p.m. She testified that the number the document was faxed from was missing and the receiving number was illegible due to a hole-punch. There was no signature from Mr. Pickford and no signature indicating it had been received, and none of the fax numbers were associated with the records office. She testified it appeared to have been faxed to another chief's office.

Andre Powell, a Memphis firefighter, testified that the defendant had been his college classmate and fraternity brother. Mr. Powell had social interactions with the defendant and victim "more than once," though not many times. Mr. Powell testified that the defendant was upset about his relationship with the victim and that he and the defendant consequently had planned a trip to visit friends in Nashville. They had planned to leave town February 12th or 13th, but Mr. Powell's mother was ill and he cancelled.

The defendant's friend Mareco Edwards testified that he was present when the victim and defendant announced their engagement. When they broke up after the graduation party, Mr. Edwards advised the victim not to call the defendant or contact him, and he gave the defendant the same advice about the victim. He saw the defendant a week later, and the defendant appeared sad and defeated. The day before the shooting, the defendant called Mr. Edwards, sounding shocked and upset.

The defendant called Sergeant Stephen Roach, who testified that he was the case coordinator in charge of investigating the shooting with the Memphis Police Department and that after developing the defendant as a suspect, he contacted the Fire Department to obtain the defendant's work schedule. He discovered that the defendant was not scheduled to work on February 11-14. Sergeant Roach subpoenaed the victim's and defendant's phone records, and he testified that the records showed that numerous calls were placed between the victim's and defendant's phone numbers between February 1 and February 3, 2010, including calls from the victim. Sergeant Roach testified that he did not recall receiving the bullets recovered from the victim through the medical examiner's office or submitting them to the Tennessee Bureau of Investigation. The recovered bullets were in an evidence bag indicating they were received by another officer on April 14, 2010. Sergeant Roach testified that it was possible that one of the three shots had been fired from another weapon, and that the bullets recovered from the victim were important. He stated that it would not be normal procedure for evidence to be tagged two months after it was received from the medical examiner.

Jonathan Weeks, the fire chief in charge of Mr. Pickford's station, testified that each firefighter maintained a file – separate from official personnel files – for certificates and other documents and that the memo regarding the defendant was not in Mr. Pickford's file. He testified that the fax machines did not always have accurate dates or times because they were not always set up correctly, and that sometimes the machines would not show the number from which a document was faxed. On cross-examination, Chief Weeks testified that he became aware of a problem between Mr. Pickford and another firefighter, advised Mr. Pickford to write the memo, and forwarded the memo to the administrative chief. He testified that he received the memo at night, and he faxed it on the next day.

Tara Watson was a friend of both the defendant and Mr. Pickford, and she testified that she spoke to both about their conflict. After the shooting, she visited the defendant in jail, and he was in tears.

The defendant, Frank Graham III, testified that he began dating the victim in 2007, and they became engaged on Christmas 2008. While she was in nursing school, he helped support her financially and sometimes cared for her eight-year-old son after school. The defendant began to suspect that the victim was having a relationship with Mr. Pickford after he saw a Face book message Mr. Pickford had sent her and when Mr. Pickford called the victim's land line and hung up.

The defendant testified that at the graduation party at the club, he wanted to leave early because someone had accidentally spilled a tableau of drinks on him. The victim did not want to leave but followed him out. He did not drag her out by the arm. They argued in the car, and the defendant asked for and reached for the engagement ring while the victim

"pulled back." After they arrived at his home, they went to sleep, and the victim did not mention that her hand was swollen. They broke off the engagement the next morning.

Two and a half weeks later, the victim texted the defendant, and ultimately they resumed their relationship. After a minor argument on New Year's Day, the victim and defendant did not speak until she called him on January 3, 2010. The defendant went to the victim's home and was speaking with her through a window when suddenly "a glass was breaking," and she yelled at him to leave. The defendant spoke with police and turned himself in when a warrant was issued for his arrest.

The defendant testified that the following Sunday, the victim came to sit by him at church. He denied threatening her life. He did not see the victim until the Tuesday prior to the shooting, when the victim used her key to enter his apartment, and they resumed their physical relationship. The defendant testified that he was able to access the victim's phone records because the victim had previously given him the password. He testified he printed them to disprove the victim's claim that she had only spoken to Mr. Pickford once.

On February 12, 2010, the defendant received a call from a man who sounded like Mr. Pickford and said, "come have breakfast at IHOP . . . with me and your b----." The defendant asked Mr. Lucas to drive him there so that the victim would not recognize the vehicle. Mr. Lucas had an appointment, and he and the defendant switched cars. The victim was not at the IHOP, but the defendant drove towards her work and saw her and Mr. Pickford at a nearby business. He then saw them in the parking lot at the medical center, kissing. The defendant approached, they exchanged words, and the forty caliber Glick went off twice. Mr. Pickford ran away.

The defendant testified that he drove home, and the keys were not in his Mercedes when police arrived. He testified that his bags were already packed for his trip to Nashville, and he was sitting in the middle of the floor crying when police arrived. The defendant testified that he thought he was in love with the victim but sometime after her graduation and before the window breaking, he found a video on her computer which showed she was unfaithful.

On cross-examination, the defendant acknowledged that he was trained as an EMT and trained in handling firearms. He testified he did not recall whether Mr. Pickford had a gun at the scene of the shooting. The defendant stated he was so frightened by the weapon going off that he ran away. He testified he did not threaten the victim and that his pastor lied about speaking with him regarding the threat. He acknowledged he had used a friend's phone to call the victim so that she wouldn't recognize the number. The defendant denied breaking the window. The defendant acknowledged that he lied to police when he told them

-13-

he had never before borrowed Mr. Lucas's car. He asserted that the police were lying when they said that his car was running. He asserted that Mr. Johnson and Ms. Hampton were lying when they testified the defendant was pulling the victim out of the club and in the parking lot.

The defendant was convicted of first degree premeditated murder and sentenced to life imprisonment. On appeal, he alleges that the evidence introduced at trial was insufficient to show premeditation. He also contests the trial court's refusal to suppress his statement to police, alleging that the officers' failure to inform him of Mr. Scholl's efforts to contact him invalidates the waiver he signed, that a pause in the interview required police to readminister warnings, and that he was detained without probable cause. The defendant further asserts that the trial court incorrectly admitted the testimony of Rev. Saulsberry and Officer Tessaro regarding the defendant's prior bad acts.

**Analysis**

**A. Sufficiency of the Evidence**

An appellate court must set aside a guilty verdict if it concludes that the evidence at trial was insufficient to support the trier of fact's finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). In making this determination, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On review, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Direct and circumstantial evidence are treated the same in weighing the sufficiency of the evidence to convict. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). Questions regarding the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are resolved by the trier of fact, and a guilty verdict accredits the testimony of the State's witnesses and resolves all conflicts of evidence in favor of the State's theory of the case. *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007). A guilty verdict replaces the presumption of innocence with a presumption of guilt, and the defendant bears the burden of proving that the evidence was insufficient to support the verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As pertinent here, first degree murder is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). The statute goes on to define a premeditated act as:

an act done after the exercise of reflection and judgment.

-14-

> "Premeditation" means that the intent to kill must have been
> formed prior to the act itself. It is not necessary that the purpose
> to kill pre-exist in the mind of the accused for any definite
> period of time. The mental state of the accused at the time the
> accused allegedly decided to kill must be carefully considered
> in order to determine whether the accused was sufficiently free
> from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The defendant's brief acknowledges that he "discharged his weapon several times, killing Taffi Crawford." However, he argues that he was enraged at the thought that Mr. Pickford was meeting the victim and was not sufficiently free from "excitement and passion."

The presence of premeditation is a question of fact for the jury to determine. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). The jury may not find premeditation based on pure speculation, but it may infer it from the manner and circumstances of the killing. *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005). Factors that tend to establish premeditation are: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The jury may consider destruction or secretion of evidence after the crime in determining premeditation. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). Likewise, planning activities by the defendant prior to the murder, the defendant's relationship with the victim, and the nature of the killing are relevant. *State v. Schmeiderer*, 319 S.W.3d 607, 635 (Tenn. 2010) (appendix). Other factors include lack of provocation by the victim and failure to provide aid or assistance to the victim. *State v. Brooks*, 249 S.W.3d 323, 329 (Tenn. 2008). Evidence of repeated blows may, coupled with other evidence, support an inference of premeditation. *Id.* Premeditation may also be inferred from the establishment of a motive for the killing. *Jackson*, 173 S.W.3d at 409.

The manner and circumstances of this killing are such that a rational trier of fact could infer premeditation beyond a reasonable doubt. Prior to the murder, the defendant declared his intention to kill the victim, with whom he had been in an unhappy relationship. On the day of the crime, the defendant borrowed a vehicle to disguise his approach. He took his loaded gun and drove to where he thought the victim would be. He lay in wait for the victim, and when she did not appear, he sought her elsewhere. He then shot the unarmed victim multiple times with a deadly weapon. Witnesses testified that the shooter shot once, paused for a few seconds, and then shot two more times. One witness saw the shooter standing up and aiming the gun at the ground before the final two shots. After the shooting, the

-15-

defendant drove away without rendering aid to the victim, discarding his jacket and gloves through the car window. The murder weapon was never found. The defendant was discovered shortly thereafter in his apartment. While he testified that he was crying on the floor, the State's witnesses testified that he told them he was getting ready to leave town. Determining the credibility of the defendant's testimony regarding his emotional state falls within the province of the jury. We conclude that the evidence was sufficient to support the conviction for first degree premeditated murder.

## B. Motion to Suppress

The defendant next asserts that his motion to suppress should have been granted because of Mr. Scholl's efforts to contact the defendant, because the defendant was held without probable cause while he was being questioned, and because detectives did not repeat the *Miranda* warnings after they took a break to get dinner. The State counters that Mr. Scholl's efforts to contact the defendant had no effect on the voluntariness of the waiver and that the defendant has waived the argument regarding probable cause by not raising it in the trial court.

A trial court's factual findings in a suppression hearing will be upheld unless the the evidence preponderates against them. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* However, findings of fact which do not require credibility determinations are reviewed de novo. *State v. Climer*, __ S.W.3d __, No. W2010-01667-SC-R11-CD, 2013 WL 1694804, at *13 (Tenn. 2013). Likewise, the trial court's application of the law to the facts is reviewed de novo with no presumption of correctness. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010).

### 1. Validity of Waiver Made Without Knowledge of Attorney's Presence

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right not to testify against himself. "Encompassed within these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation." *State v. Sailor*, 117 S.W.3d 239, 244 (Tenn. 2003). When an accused makes a statement to police during custodial interrogation, it must not only pass the due process test of voluntariness, but must also demonstrate "the use of procedural

safeguards effective to secure the privilege against self-incrimination," which include warnings that the accused has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have an attorney present during questioning, whether retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

If a suspect invokes his right to remain silent or if he requests an attorney, interrogation must cease. *Climer*, __ S.W.3d at __, 2013 WL 1694804, at *15. This is because a subsequent waiver which is not at the accused's instigation is "not the purely voluntary choice of the suspect." *Id.* at *16 (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)). Insofar as the defendant is asserting that he was denied his right to counsel because he requested an attorney and was told that he could not speak to one until after he had signed a statement, the trial court made a factual finding that the defendant's testimony was not credible and that he did not request an attorney. The evidence does not preponderate otherwise.

Because the defendant did not invoke his rights, we proceed to the next inquiry: whether or not he made a valid waiver of those rights. In the absence of invocation, the State must establish, by a preponderance of the evidence, that the defendant in fact knowingly and voluntarily waived his rights. *Climer*, __ S.W.3d at __, 2013 WL 1694804, at *21. A waiver is voluntary when "it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception." *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994) *abrogated on other grounds by Sailor*, 117 S.W.3d at 246. The waiver must also be made with a full awareness of the nature of the right relinquished and the consequences of abandoning that right. *Climer*, __ S.W.3d at __, 2013 WL 1694804, at *22.

The defendant contends that his waiver was not valid because he was not aware that an attorney retained by his family was attempting to contact him. In *Moran v. Burbine*, 475 U.S. 412, 417 (1986), an attorney contacted by the defendant's sister regarding an unrelated burglary had called the police station where he was held and informed police she was acting as his counsel. She was told that he would not be questioned that night and was not told he was suspected to have been involved in a murder. *Id.* The Court in *Burbine* held that, under the federal constitution, the suspect's subsequent waiver of rights was not invalidated simply because the suspect was not informed that a particular attorney was attempting to contact him, as "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. Although there, as here, the lower court had found that police did not intentionally or maliciously withhold the information from the defendant or the attorney, the Court concluded that "even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident," and the deliberate withholding of information from the defendant "is only

-17-

relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 423-24.

*Burbine* left open the possibility that a state's constitution might offer broader protection, and, indeed, several states have concluded that an accused cannot knowingly, intelligently, and voluntarily waive the right to counsel when an attorney's attempts to contact the accused are kept from the accused's knowledge. *See Stephenson*, 878 S.W.2d at 545-46 (citing cases); *see also, e.g., Commonwealth v. McNulty*, 937 N.E.2d 16, 25-26 (Mass. 2010). Tennessee, however, in *State v. Stephenson*, declined to join the ranks of these states, and the *Stephenson* Court concluded that the defendant's waiver was valid despite the fact that police did not inform him that an attorney contacted by his father was waiting to see him. *Stephenson*, 878 S.W.2d at 547. The Court reasoned:

> We do not believe that the suspect's knowledge of the location of a particular counsel can affect the intelligent waiver of his constitutional rights as described in Miranda warnings. Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location of a particular attorney is not constitutionally required information.

*Id.* at 546-47 (quoting *State v. Hanson*, 401 N.W.2d 771, 778 (1987)). The case at bar, where the defendant was not alerted that his family had contacted an attorney to represent him and that the attorney was available to consult with him, is indistinguishable from *Stephenson* and *Burbine*. Moreover, although the defendant testified that he did not know that his family had contacted Mr. Scholl, he stated that he was aware he could have an attorney. We conclude that Mr. Scholl's efforts to alert law enforcement to the fact that he was representing the defendant did not invalidate an otherwise valid knowing and intelligent waiver of the defendant's rights.

## 2. Probable Cause for Arrest

-18-

As another avenue to suppress his statement, the defendant asserts that he was being held unconstitutionally and without probable cause, and he cites *State v. Bishop* for the proposition that the Memphis Police Department's use of a "48 Hour Detention" form was unconstitutional. *See State v. Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969, at *8 (Tenn. Crim. App. March 14, 2012) ("The '48-hour hold' does not exist in our constitutional pantheon of acceptable practices."). The State counters that the defendant has waived this issue by failing to properly raise it in the trial court and in his motion for a new trial.

The motion to suppress is not a part of the record, although a copy of the document is appended to the defendant's brief. The motion attached to the defendant's brief does not contain particularized grounds for relief. Instead, it recites various general grounds, including that the defendant was detained without probable cause, that he was denied the right to counsel, and that the thirty-six-year-old defendant was a juvenile at the time of the statement. A form entitled "Order Granting 48 Hour Detention for Probable Cause" is also attached to the defendant's brief but not included in the record. The defendant made a passing reference to lack of probable cause at the hearing on the motion to suppress. However, it is evident from the hearing on the motion to suppress and from the trial court's order that this issue was never argued before or decided by the trial court.

A motion to suppress evidence must be made prior to trial and failure to do so results in waiver. Tenn. R. Crim. P. 12(b)(2)(C), 12(f)(1). Such a motion must also state with particularity the grounds upon which relief is sought. Tenn. R. Crim. P. 47(c)(1); *State v. Jefferson*, 938 S.W.2d 1, 9 (Tenn. Crim. App. 1996) (noting that motion containing "bare allegations of law" rather than factual allegations may not be entitled to hearing); *State v. Bell*, 832 S.W.2d 583, 588-89 (Tenn. Crim. App. 1991). Tennessee Rule of Appellate Procedure 36 allows an appellate court to grant relief to which a party is entitled, but does not require that relief "be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). This reflects "the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a) Advisory Comm'n cmt. Here, the defendant's one casual reference to probable cause during the hearing was not sufficient to raise the issue. "[T]he existence of probable cause depends upon the accumulated information known to law enforcement." *State v. Echols*, 382 S.W.3d 266, 278 (Tenn. 2012). Because the question was not at issue, the record does not delve into what information officers had when they took the defendant into custody. The failure to raise this issue with particularity in the motion to suppress or at the hearing results in waiver.

Not only must the ground be raised in a motion to suppress, but a ground upon which

a new trial is sought is waived unless specifically stated in a motion for a new trial. Tenn. R. App. P. 3(e). The issues raised in a motion for new trial must be specified with reasonable certainty so that the appellate courts can ascertain whether the issue was first presented to the trial court for correction. *State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981); *see also Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007). The defendant's motion for a new trial challenges the denial of the motion to suppress without specifying the grounds; at the hearing, the defendant's attorney argued only that the motion should have been granted because the facts of this case were distinguishable from *Burbine*. Because this ground was not argued before the trial court or presented in the motion for a new trial, we conclude that the State is correct in asserting that it has been waived.

### 3. One-Hour Lapse in Interrogation

The defendant finally asserts that his confession should have been suppressed because detectives did not reread his *Miranda* rights to him after they left the interview room for an hour while the crime scene investigators checked him for gunshot residue. Initially, we note that this issue was never decided by the trial court. Although the defense, at the hearing on the motion to suppress, made a passing reference to the fact of the delay and the authorities' failure to readminister the *Miranda* warnings, no legal arguments were presented that failure to do so invalidated the waiver. The defendant's written motion to suppress does not present this issue with particularity, and it was not addressed in the trial court's order. *See* Tenn. R. Crim. P. 47; *Bell*, 832 S.W.2d at 588-89. Neither did the defendant raise it in either the motion for a new trial or the hearing on that motion. *See* Tenn. R. App. P. 3(e). Accordingly, it has been waived.

In any case, the defendant would not be entitled to relief on this issue. "A valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *State v. Rogers* 188 S.W.3d 593, 606 (Tenn. 2006). In deciding whether it is necessary to readminister warnings, the court must look to the totality of the circumstances. *Id.* Factors include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. *Id.* Here, the amount of time was approximately one and one half hours, which is significantly less than time lapses previously upheld by our courts. *See id.* at 608 ("Neither the five-hour time lapse nor any intervening event rendered Rogers incapable of remembering the prior advisement of his rights."). The defendant remained in the same room with the same detectives and

questioned about the same incident. Although the detectives left to get dinner and he received no reminder regarding his rights on their return, he was continuously in the company of law enforcement. *See id.* at 607. The defendant had some college education and testified that, as a firefighter, he received some training with police and felt he shouldn't be talking to detectives. Even if this argument were not waived, the warnings did not need to be readministered under the factors outlined above, and this issue is without merit.

### C. Testimony Regarding Prior Bad Acts

The defendant next challenges the trial court's decision to admit the testimony of Pastor Saulsberry regarding the defendant's threat to the victim and the testimony of Officer Tessaro regarding the broken window. The State asserts that this argument is likewise waived.

A party claiming that the trial court has erroneously admitted evidence may not predicate error on the ruling unless "a timely objection or motion to strike appears of record," stating the specific ground. Tenn. R. Evid. 103(a)(1). As noted above, "[n]othing in [Tennessee Rule of Appellate Procedure 36] shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008) (appendix) (citing Tenn. R.App. P. 36(a)). Furthermore, Tennessee Rule of Appellate Procedure 3(e) requires that an error in admitting evidence cannot be raised unless it was specifically stated in a motion for a new trial.

The transcript of the trial does not contain any record of an objection to the testimony of Officer Tessaro. While the motion for a new trial asserts that the trial court erred in allowing "certain inadmissible evidence," the defendant, at the hearing on the motion for a new trial, explained that this referred to Pastor Saulsberry's testimony. The defendant has waived any error predicated on the admission of Officer Tessaro's testimony.

The admissibility of Pastor Saulsberry's testimony, on the other hand, was both raised in the defendant's motion for a new trial and apparently litigated at trial. The defendant objected to the testimony based on the clerical privilege, on the rule against hearsay, and on the fact that it was inadmissible character evidence under Tennessee Rule of Evidence 404(b). On appeal, the defendant has not pursued the argument that it was a privileged communication which should have been excluded. *See* Ct. Crim. App. R. 10(b) ("Issues

which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Under Tennessee Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts may be admitted under certain conditions:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The trial court's decision to admit evidence after substantially following the procedures outlined in Rule 404(b) is reviewed for an abuse of discretion. *State v. Gilley*, 173 S.W.3d 1, 5 (Tenn. 2005).

References in the record establish that the trial court held what the defense described as a "lengthy" jury-out hearing to settle the hearsay[2] and 404(b) issues. The hearing apparently took place either the first or second day of trial. However, the transcript omits this hearing. The appellant bears the burden of preparing a full and complete record for appellate review. *Banks*, 271 S.W.3d at 169 (appendix); *see* Tenn. R. App. P. 24(b). "What is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered." *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005). When no evidence is preserved in the record for review, the appellate court may not consider the issue. *State v. Goodwin*, 909 S.W.2d 35, 43 (Tenn. Crim. App. 1995). Where an argument is noted but not transcribed and the record is missing a transcript of the proceedings relevant to an issue presented for review or portions of the record upon which the party relies, appellate review of the argument is waived. *See State v. Mickens*, 123 S.W.3d 355, 387 (Tenn. Crim. App. 2003). Given a transcript which is inadequate to provide a basis for proper review, the appellate court must presume that the trial court's determination of the issue was correct. *State v. Thompson*, 131 S.W.3d 923, 927 (Tenn. Crim. App. 2003) (citing *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). The defendant supplemented

---

[2]The record suggests that the trial court also excluded certain testimony from Rev. Saulsberry based on hearsay.

the record with certain transcripts, but the record ultimately does not contain the portions relevant to the decision to admit Pastor Saulsberry's testimony. The record simply does not allow this Court to determine whether the dictates of Tennessee Rule of Evidence 404(b) were followed or whether the trial court abused its discretion. Accordingly, this issue is also without merit.

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is an exception to the rule against hearsay. Tenn. R. Evid. 803(2). While the record is missing the hearing in which the trial court concluded that the statement about the threat was an excited utterance, Rev. Saulsberry's testimony does establish that the victim was hysterical and crying when she called him about five hours after the event. The "length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance," but is simply relevant to the finding that the declarant was under stress. *Banks*, 271 S.W.3d at 117 (quoting *Williams v. State*, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007)). Accordingly, when circumstances support the finding that the declarant was under stress, even a longer lapse of time is not fatal to the exception. *State v. Stout*, 46 S.W.3d 689, 699-700 (Tenn.2001), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004) (concluding that declarant was under stress after twelve hours); *Banks*, 271 S.W.3d at 116-17 (concluding that four- to six-hour interval did not preclude statement as excited utterance). Without the hearing transcript, we cannot determine what factors the trial court considered, but we nevertheless reject the defendant's argument that a five-hour lapse per se excludes the utterance from the exception. *See State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997) (listing factors relevant to the determination of stress). Accordingly we reject the defendant's arguments based on errors in admitting testimony.

## Conclusion

Based on the foregoing, we conclude that the trial court did not err, and we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE