# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 6, 2013

## STATE OF TENNESSEE v. RAYMOND DENTON

**Appeal from the Criminal Court for Shelby County**
**No. 11-02711      Chris Craft, Judge**

**No. W2012-01686-CCA-R3-CD  - Filed December 10, 2013**

Following a jury trial, Defendant, Raymond Denton, was convicted of aggravated rape, in violation of Tennessee Code Annotated section 39-13-502; aggravated burglary, in violation of Tennessee Code Annotated section 39-14-403; and physical abuse of an impaired person, in violation of Tennessee Code Annotated section 71-6-119.  The trial court sentenced Defendant as a career offender for each conviction to sixty (60) years for aggravated rape, fifteen (15) years for aggravated burglary, and fifteen (15) years for physical abuse of an impaired person.  The sentences were ordered to be served consecutively to each other for an effective sentence of ninety (90) years.  In this appeal, Defendant does not challenge any of the sentences imposed, and does not challenge the convictions for aggravated burglary and physical abuse of an impaired person.  Defendant's sole issue is a challenge to the legal sufficiency of the evidence to support his conviction of aggravate rape, limited to the argument that there was insufficient proof establishing the element of penetration.  After a thorough review of the record and the briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, District Public Defender; Harry E. Sayle, III, Assistant Public Defender; William Yonkowski, Assistant Public Defender; and Robert Felkner, Assistant Public Defender; Memphis, Tennessee, for the appellant, Raymond Denton.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; Jennifer Nichols, Assistant District Attorney General; and Eric Christiansen, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

When an accused challenges the sufficiency of the convicting evidence, the appellate court determines "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Rogers*, 188 S.W.3d 593, 616 (Tenn. 2006); *see also* Tenn. R. App. P. 13(e). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). The trier of fact resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The appellate court does not re-weigh or re-evaluate the evidence. *See State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *See State v. Moats*, 906 S.W.2d 431, 433-4 (1995).

"Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

As pertinent to Defendant's case, the elements of aggravated rape are set forth as follows:

> **39-13-502. Aggravated rape.** — (a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (1) * * *
> (2) The defendant causes bodily injury to the victim.
> (3) * * *

Tenn. Code Ann. § 39-13-502(a)

"Sexual penetration" is defined in Tenn. Code Ann. § 39-13-501(7) as,

-2-

sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's the defendant's, or any other person's body, but emission of semen is not required.

**Facts**

We will summarize the evidence presented at trial which is relevant to the specific issue raised by Defendant in this appeal. Generally, the State's proof showed that on the night of November 8, 2010, the 75-year-old victim was at her home watching television when Defendant broke into her home by kicking in her back door. Defendant demanded the victim's money. When told by the victim that she had none, Defendant told her he wanted to "f***" her. Defendant proceeded to sexually assault the victim for at least two hours. In the course of this, the victim was injured and as a result required hospitalization. When the nude Defendant fell asleep, the victim crawled out from underneath him, got to her telephone, and called 9-1-1. When police arrived shortly thereafter, Defendant was still on the floor asleep and was handcuffed and taken to jail. The victim was taken to a rape crisis center and from there to a hospital.

As to the specific element of sexual penetration, the testimony was as follows. Memphis police officer Brandon Berry was the first officer to arrive at the scene. After the nude Defendant, who was asleep on the floor, had been handcuffed and placed into a patrol car, Officer Berry spoke with the victim. She appeared withdrawn, nervous, scared, frail, and her hair was out of place. The victim told Officer Berry that Defendant, after breaking into the house, pulled the victim from the chair in which she sat, took off her clothes and his own clothes, and began the sexual assault on the floor. She told Officer Berry that Defendant's assault went on for a long period of time, and that Defendant was choking and "smothering" her. Officer Berry testified that the victim said that Defendant tried to put his penis in her but he "couldn't get anywhere."

The victim testified that she was watching television in her home late on the night of November 8, 2010. She heard Defendant burst in her locked back door. She did not know Defendant. He first demanded her money. When she told him she had no money, Defendant said he wanted the next best thing - he wanted to "f***."

Defendant grabbed both of the victim's arms and threw her on the floor. He removed her clothing, which was her pajamas, and he removed his own clothes. She testified that Defendant began "feeling" on her privates. She specifically stated that, "after [Defendant] pulled my clothes off and threw me down on the floor, then he had sex with me."

-3-

Defendant was also choking the victim and she testified she was going "in and out" of consciousness while defendant choked her.

The victim testified that Defendant had a difficult time maintaining an erection and that he would rub his penis on her legs and her private areas when he would lose an erection. During cross-examination, the victim, 75 years old at the time of the crimes, reiterated that Defendant was trying really hard to rape her, but he was having a difficult time maintaining an erection. She clarified that at the point when she was at the rape crisis center, when she told that Defendant "tried" to rape her, she was unaware that Defendant had in fact raped her. The victim testified that she knew Defendant had raped her when she found out she "had that stuff on [my legs]." Further, during cross-examination, Defendant's attorney asked the victim, "so [Defendant] couldn't get his penis in you, could he?" The victim responded, "Yeah, he did, he would rub me."

Frazel Bennett, a registered nurse and one of the victim's granddaughters, went to the victim's home on the night of the crimes after being called by the victim at 3:19 a.m. on November 9, 2010. She found the victim sitting in her chair in a large pool of blood. The blood was from the victim's vaginal area. She and her sister took the victim to the rape crisis center. Ms. Bennett observed the examination performed on the victim by the nurse practitioner at the rape crisis center. Ms. Bennett saw a laceration on the victim's vagina "down like an episiotomy type of laceration."

Sergeant Stephen Wilkerson of the Memphis Police Department interviewed the victim on November 10, 2010. The victim told Sergeant Wilkerson that Defendant did not penetrate her, saying Defendant "couldn't get it in because it wouldn't stay hard."

Judy Pinson, a nurser practitioner employed at the Memphis rape crisis center for twenty-five years, testified that she performed an examination of the victim, who arrived at the rape crisis center on November 9, 2010, at 7:30 a.m. Ms. Pinson was permitted to testify at trial as an expert witness as a forensic nurse practitioner with a specialty in the field of sexual assault examinations. The victim told Ms. Pinson in general terms what had happened during the assault, including stating that Defendant had, in Ms. Pinson's words, "attempted vaginal penetration." This was written in Ms. Pinson's report. Ms. Pinson was unable to use a speculum to look inside the victim's vagina due to an attempt to do so was too painful for the victim. The standard report form did not have a place for the nurse practitioner to place any expert medical related opinion.

During Ms. Pinson's examination of the external area of the victim's private areas, she saw a superficial laceration of the labia majora. Also, Ms. Pinson observed a laceration at least two inches long beginning at the posterior fourchette which extended into the perineal

area, which she testified was the area between the vagina and the anus. Ms. Pinson noted that the victim was bleeding from this laceration. The significance of Ms. Pinson's observations concerning the two-inch laceration is shown in this excerpt from her direct examination by the State:

Q. Okay. This injury that you described, not the superficial injury to - - but the laceration between her vagina or the fourchette, up into the perineum, do you have an opinion based on your education, thousands of exams that you've done, as to whether or how that injury was received, what mechanism?

A. There was penetration of her vagina. We many times don't see injuries in rapes or sexual assaults. It's fairly common not to see injury. And there aren't very many things that we can say for sure come from a penetrating injury but this is one of them. Injuries to the posterior fourchette don't come from anything else except something going into the vagina.

Q. Does the fact that Miss Gray gave you a history of attempt penetration, did that in any way change your opinion about what had happened and what you saw and your conclusions?

A. No. Because I don't have - - I have no knowledge of what somebody - - of what somebody's definition of penetration is. I don't know if - - I don't know what Mrs. Gray thinks penetration is. I don't know if - -

Q. What do you call penetration, because you called this a penetrating, something penetrated the vagina?

A. Something had to have gone into the vagina to make that kind of injury. There's no other way to get an injury like that.

Q. And because you were not able to look inside her, do you have any opinion at all about how far the something had to go inside of her to cause the tear that was several inches?

A. It only has to go in far enough to cause the injury and because that area which is the posterior fourchette is the first place that a penis would enter or anything would enter that went - - to go inside of her,

that's why we say that that's - - that's the only way that you - - that's the only time we see that kind of injury. It's the first - - the first plane of entry to the vagina.

Defendant did not testify or offer any other proof.

**Analysis**

Any intrusion into the vagina, "however slight" is sufficient to meet the statutory definition of sexual penetration, an essential element of aggravated rape. The victim made some statements that Defendant attempted to rape her, and a jury could infer from that statement that no sexual penetration occurred. On the other hand, the victim testified that she initially believed Defendant had not raped her when she was at the rape crisis center, but she clarified that she later learned that he did, in fact, rape her. The victim testified that she was "choked" and "smothered" by Defendant during the sexual assault which she said lasted about two hours. She testified that she passed "in and out" of consciousness. She was bleeding from a laceration in her vaginal area. An expert witness conclusively stated that in her opinion the laceration had to have been caused by penetration of the vagina.

All of these facts were presented to the jury. Taken in the light most favorable to the State, there is sufficient evidence of unlawful sexual penetration to sustain Defendant's conviction for aggravated rape. As noted above, the jury's verdict of guilt resolves all conflicts in the evidence in the State's favor. *Moats*, 906 S.W.2d at 433-34. The jury was entitled to accredit some of the testimony of any witness but discredit other testimony from the same witness. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978).

Defendant is not entitled to relief in this appeal. Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE